Marilyn **CENTANNI**, Plaintiff–Appellee,

v.

**EIGHT UNKNOWN OFFICERS,** Defendants–Appellants.

No. 92–4331.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1993.

Decided Feb. 3, 1994.

Lois J. Robinson (briefed), Robert J. Rotatori (argued), Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH, for plaintiff-appellee.

Vincent A. Feudo (briefed), William F. Schmitz (argued and briefed), Kitchen, Deery & Barnhouse, Cleveland, OH, for defendants-appellants.

Before: MARTIN and JONES, Circuit Judges, and DEMASCIO, Senior District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendants–Appellants Eight Unknown Officers ("the Officers") appeal the district court's denial of their motion for summary judgment on their claim of qualified immunity from Plaintiff–Appellee Marilyn Centanni's section 1983 lawsuit alleging that they violated her Fourth Amendment right to be free from unreasonable searches and seizures. For the reasons set forth below, we affirm.

## I.

Shortly before midnight on February 19, 1991, the victim of a shooting incident entered the Walton Hills (Ohio) Police Department and identified his assailant as Nicholas Lombardo. When further investigation revealed that Lombardo lived in Mayfield Heights, Ohio, and that he owned a blue van that matched the description given by the shooting victim, the Mayfield Heights Police Department dispatched some officers to stake out the Lombardo residence until Walton Hills authorities could obtain a warrant for his arrest.

Prior to the shooting, Centanni went to the Lombardo residence to visit her boyfriend, the son of Nicholas Lombardo. Nicholas Lombardo arrived at his home at approximately 11:15 p.m. Centanni, however, neither saw nor spoke to him that evening and left the house at approximately 12:25 a.m. Upon observing an unknown person (Centanni) leaving the Lombardo residence by car, the police officers surveying the house stopped the vehicle. After being pulled over, Centanni consented to a search of her purse,

* The Honorable Robert E. DeMascio, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

car, and person. The officers found nothing incriminating.

The officers then informed Centanni of the shooting incident and, despite having no evidence linking her to the crime under investigation, told her that she had to accompany them to the police station. The officers made it clear that she was not free to leave; accordingly, she drove to the station escorted by two police cars.

At the station, the officers immediately took Centanni to an interview room within the jail area. Even though she was not charged with any offense, Centanni was read her *Miranda* rights and then waived them. The officers questioned Centanni for approximately thirty minutes about the layout of the Lombardo home, the events of that evening, and whether any firearms were in the house.

Concerned that Centanni might contact Lombardo if she were released, the officers decided to keep her at the station until Lombardo was arrested. Centanni was given a "choice" of staying in either a jail cell or the visitor's part of the prisoners visiting room. She chose the visiting room.

At about 4:00 a.m. that morning, the Mayfield Heights SWAT team arrested Lombardo at his home without incident. Centanni was released from the station at approximately 4:20 a.m.—almost four hours after her initial detention.

Centanni later filed suit under 42 U.S.C. § 1983, claiming violations of her Fourth and Fourteenth Amendment rights resulting from her stop, search, and detention. The Officers answered with a general denial and raised the affirmative defense of qualified immunity. Both parties moved for summary judgment. The district court held that, while the initial stop and search of Centanni was constitutionally permissible, her removal to the police station and her continued detention amounted to a de facto arrest. Finding no probable cause, the court granted partial summary judgment for Centanni. In addition, the court determined that the Officers' actions violated clearly established law and

so rejected their claim for qualified immunity. The Officers now appeal.[1]

## II.

The Officers contend that they are entitled to qualified immunity because Centanni was never formally arrested and, due to the presence of exigent circumstances, they acted reasonably in detaining her. Clearly established law, however, dictates that this contention must be rejected.

■ Qualified, or "good faith," immunity is an affirmative defense, available to government officials performing discretionary functions, which shields them from civil liability under § 1983 for allegedly unlawful conduct. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 818, 102 S.Ct. 2727, 2736, 2738, 73 L.Ed.2d 396 (1982). The analytical structure for addressing the applicability of the defense in any given case is two-fold, consisting of both a legal and factual determination.

■ The threshold issue is whether a constitutional right has been violated. *Siegert v. Gilley,* 500 U.S. 226, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). If so, then in order to overcome a qualified immunity defense, a plaintiff must show that the law regarding this right was "clearly established" at the time that the constitutional violation occurred. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. "Objective legal reasonableness" is the touchstone of this determination. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). That is, for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. Thus, this standard demands that the "right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986); *see also Anderson,* 483 U.S. at 640, 107 S.Ct. at

---

1. Although there is not yet any final judgment, we still have jurisdiction over this case. A district court's denial of a claim of qualified immunity is treated as a final appealable order within

the meaning of 28 U.S.C. § 1291. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).

3039 ("[I]n the light of pre-existing law the unlawfulness must be *apparent.*") (emphasis added); *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1096 (6th Cir.1992) ("[T]he right asserted by the plaintiff must be 'particularized' as opposed to a general right."); *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042–43 (6th Cir.1992) ("[T]o find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself.").

### III.

The alleged constitutional violation at issue stems from the Fourth Amendment's guarantee, as incorporated against the states by the Fourteenth Amendment, that government officials may not subject citizens to unreasonable searches or seizures without proper authorization. An intrusion that lacks such authorization is presumptively unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 356, 19 L.Ed.2d 576 (1967). For instance, police need only have a reasonable suspicion of criminal activity to conduct a brief investigatory detention. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). A determination of reasonableness depends on a balance between "the need to search [or seize] against the invasion which the search [or seizure] entails." *Id.* at 21, 88 S.Ct. at 1879. But when that detention rises to the level of a full-fledged arrest, the Fourth Amendment demands that the seizure be supported by probable cause. *See, e.g., Dunaway v. New York,* 442 U.S. 200, 212–14, 99 S.Ct. 2248, 2256–58, 60 L.Ed.2d 824 (1979).

The Officers contend that because they never formally arrested Centanni, the constitutionality of her prolonged detention need only be analyzed under the reasonableness balancing test of *Terry.*[2] This argument, however, suffers from both an erroneous

premise and a misguided application of Fourth Amendment jurisprudence.

The fact that the Officers never *formally* arrested Centanni does not resolve the issue of whether her detention required probable cause. The Fourth Amendment's protections are not limited to "traditional" arrests; indeed, "[a] clear deprivation of liberty caused by law enforcement officers without formal words is nonetheless an arrest." *United States v. Canales,* 572 F.2d 1182, 1187 (6th Cir.1978). Thus, "at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Hayes v. Florida,* 470 U.S. 811, 815–16, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985). To be sure, no bright-line test exists for making this determination. *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983); *United States v. Hatfield,* 815 F.2d 1068, 1070 (6th Cir.1987). But it is clear that the line between an investigatory detention and an arrest is crossed "when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be *and transport him to the police station,* where he is detained, although briefly, for investigative purposes." *Hayes,* 470 U.S. at 816, 105 S.Ct. at 1646 (emphasis added).

According to the Officers, that line was never crossed; therefore, they maintain that Centanni's detention should be examined under the "reasonableness" lens of *Terry.* In support of this argument, the Officers rely heavily on *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), in which the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is con-

---

2. The initial stop and search of Centanni is not contested on appeal. Rather, as the district court concluded, the police had a reasonable suspicion that the car Centanni was driving contained either the suspect of their investigation or the firearm used in the shooting. *See Terry v.*

*Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Accordingly, the issue on appeal is the constitutionality of the subsequent detention and removal to the police station.

ducted." *Id.* at 705, 101 S.Ct. at 2595. In *Summers,* the Court reached its decision after concluding that exigent circumstances—such as the risk of flight and harm to the officers—outweighed the intrusion on the occupant's Fourth Amendment rights. *Id.* at 701–03, 101 S.Ct. at 2593–95. Similarly, the Officers argue that the "limited" invasion of Centanni's personal liberty was reasonable because of the possibility that she might have alerted Lombardo of his impending arrest, which could have triggered an "armed encounter or hostage situation." Appellants' Br. at 25.

However, as the district court determined, the Officers' reliance on *Summers* is severely misplaced. The district court distinguished *Summers* on three grounds: 1) the detention in that case was incident to a proper search warrant; 2) Summers was an "occupant" of the premises named in the search warrant; and 3) Summers' detention was brief, limited only to the time necessary to search the premises. Significantly, the detention in *Summers* was confined to the suspect's home. The Court implicitly recognized as much when it noted that such a seizure involves "neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Summers,* 452 U.S. at 702, 101 S.Ct. at 2594.

■ Centanni's detention more closely resembles the facts of *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), where the police—without probable cause[3]—took Dunaway to the station for questioning and, after obtaining incriminating statements, placed him under arrest. According to the police, the initial seizure and subsequent detention did not amount to an arrest because they had a "reasonable suspicion" that Dunaway possessed "intimate knowledge about a serious and unsolved crime." *Id.* at 207, 99 S.Ct. at 2253. The *Dunaway* Court, however, refused to adopt a multifactor balancing test of "reasonable police conduct under the circumstances." *Id.* at 213, 99 S.Ct. at 2257. Instead, the Court

made it clear that such a test is limited to the "narrowly defined intrusions involved in *Terry* and its progeny." *Id.* at 213, 99 S.Ct. at 2257 (noting that "the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause"). Thus, the Court held that the police violated the Fourth Amendment when they seized Dunaway and transported him to the police station for interrogation. *Id.* 442 U.S. at 216, 99 S.Ct. at 2258.

Neither *Terry* nor its progeny—including *Summers*—addressed a situation where the police seized an individual whom they did not even suspect of any crime and transported her to the station, questioned her extensively in the middle of the night, and then kept her under surveillance in a prisoners visiting room. "Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id.* at 213, 99 S.Ct. at 2257.

Accordingly, we hold that Centanni's prolonged detention was not one of the "narrowly defined intrusions" contemplated by *Terry.* While the line between a reasonable *Terry* "stop" and de facto arrest is often unclear, it is quite apparent that there is no such thing as a *Terry* "transportation." Rather, the removal of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 692 n. 2, 105 S.Ct. 1568, 1578 n. 2, 84 L.Ed.2d 605 (Marshall, J., concurring) ("A stop can also be unduly intrusive if the individual is moved or asked to move more than a short distance …"); *Florida v. Royer,* 460 U.S. 491, 502–03, 103 S.Ct. 1319, 1326–28, 75 L.Ed.2d 229 (1983) (plurality opinion) (stop converted to arrest when officers moved detainee from concourse to small room during airport stop); *United States v. Martinez,* 808 F.2d 1050, 1055 (5th Cir.) (stop converted to

---

3. The police had obtained an anonymous tip that supplied a possible lead implicating Dunaway in a crime. *Dunaway,* 442 U.S. at 203, 99 S.Ct. at 2252. But after questioning the supposed source of the lead—a jail inmate awaiting trial for burglary—they learned nothing that supplied enough information to obtain an arrest warrant. *Id.* Nevertheless, Dunaway was picked up at a neighbor's house and taken into custody for questioning. *Id.*

arrest when police transported passengers to station after finding drugs in car), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). Clearly, the police exceeded *Terry's* ambit when they extended Centanni's initial roadside detention into an all-night affair at the station house.

Any arrest, whether it be formal or de facto, requires probable cause. In general, this standard requires that the police have "reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The Officers never assert that they had any cause, much less probable cause, to believe Centanni either had committed or was committing a crime. Therefore, as the district court determined, Centanni should have been free to leave once it was established that she was not involved in any criminal activity.

Thus, the Officers did violate Centanni's Fourth Amendment right to be free from an unreasonable seizure. This conclusion, however, does not end the inquiry.

### IV.

■ In addition to establishing a constitutional violation, a plaintiff must show that the right in question was "clearly established" to overcome a defense of qualified immunity. *See Harlow,* 457 U.S. at 816–18, 102 S.Ct. at 2737–38. While "clearly established" does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, it does imply that the unlawfulness of the official action must be reasonably apparent. Accordingly, the phrasing of the issue must be sufficiently particularized so as not to render the defense meaningless by converting it "into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* at 639, 107 S.Ct. at 3038.

In light of the decisions discussed above, we conclude that it has been clearly established that—regardless of any exigent cir-

cumstances—the seizure and removal to the station house of an individual who is not suspected of any criminal activity constitutes a de facto arrest requiring probable cause. Surely, any reasonable official would understand that a warrantless intrusion of this degree has simply never been tolerated by this court or any other.

### V.

For the foregoing reasons, we AFFIRM the district court's ruling that the Officers effectively arrested Centanni without probable cause and its denial of the Officers' motion for summary judgment on their claim for qualified immunity because clearly established law renders such action unconstitutional.