**Darlene JONES, et al., Plaintiffs,**

**v.**

**CITY OF YOUNGSTOWN, et al., Defendants.**

**No. 4:93CV2115.**

United States District Court, N.D. Ohio.

Oct. 14, 1997.

James Bruce Callen, Tammie Riley Jones, Northeast Ohio Legal Serv., Youngstown, OH, for Plaintiffs.

Marshall D. Buck, Comstock, Springer & Wilson, Youngstown, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

On October 6, 1993, Plaintiffs filed the above-captioned matter against the City of Youngstown, Ohio ("Youngstown") and several of its officials and police officers alleging a denial of civil rights accorded to them by the Fourth, Fifth, Ninth and Fourteenth Amendments. They seek compensatory and punitive damages in the amount of $2,000,000 and declaratory relief. Jurisdiction is predicated upon 28 U.S.C. § 1343(a)(3)-(4) and 42 U.S.C. § 1983.

On March 29, 1996, Plaintiffs filed a Motion for Partial Summary Judgment (Dkt # 45). On August 29, 1996, Defendants filed a response. On April 10, 1996, Defendants filed their own Motion for Partial Summary Judgment (Dkt # 49). On April 25, 1996, Plaintiffs filed a response. For the following reasons, Plaintiffs' Motion is **GRANTED** in part and **DENIED** in part. Defendants' Motion is also **GRANTED** in part, and **DENIED** in part.

### *I. FACTS.*

The Plaintiffs, Darlene Jones ("Dar.Jones"), David Jones (Dav.Jones), Christine King ("King"), Michael Noble ("Noble"), Vergie Mitchell ("Mitchell"), Beverly Oliver ("Oliver"), Van Richmond ("Richmond"), and Rochelle Wallace ("Wallace") were Youngstown residents. During the period of August 1993 through October 1993, Youngstown housing inspectors accompanied by police officers conducted inspections of Plaintiffs' residences. Plaintiffs were ordered to vacate their residences by the housing inspectors pursuant to Section 311(b) of the City of Youngstown Housing Code ("YHC") Ordinance 85226. This section authorizes an inspector to order that a residence be vacated if the residence creates a health emergency for either the inhabitants or the community. The inspectors ordered Plaintiffs from their residences and placed placards on their dwellings to prohibit anyone from entering or trespassing. In most cases, they cited leaking soil stacks as grounds for issuing the orders to vacate. Plaintiffs were not permitted to return to their residences until the cited violations were corrected.

Plaintiffs contend that such practices violated their rights to procedural and substantive due process as secured by the Fourteenth Amendment to the United States Constitution. Specifically, they state that they were not provided with adequate notice informing them of their right to appeal the emergency orders and that they were never granted either a pre or postdeprivation hearing to contest such orders. Furthermore,

Plaintiffs allege that the policies and practices of Youngstown permitted inspectors and police officers to search their homes without warrants and without consent under the pretext of housing code violations.

Plaintiffs now move for partial summary judgment on the issue of liability in their claims of a violation of due process and the constitutionality of the Youngstown Housing Code Ordinance. Defendants have moved for summary judgment on Plaintiffs' conspiracy claim, substantive due process claim, and on Plaintiffs' state claim. The Defendant Police Officers further contend that they are entitled to qualified immunity.

## *II. STANDARD OF REVIEW*

FED.R.CIV.P. 56(c) governs summary judgment and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law ...

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the nonmoving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (1995). If the moving party meets this burden, then the nonmoving party must present more than a scintilla of evidence in support of his or her position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the nonmoving party for a judge or jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

## *III. ANALYSIS*

### A. The Constitutionality of Youngstown Housing Code

Defendants request summary judgment on the constitutionality of Section 305(b) of the YHC. Plaintiffs argue that the sections of the YHC pertaining to emergency orders to vacate are facially unconstitutional as they allow for the deprivation of property without due process of law. A facial challenge to the statute must be rejected unless there exists no set of circumstances in which the statute can be constitutionally applied. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). "When the constitutionality of a statute is challenged, it is the court's obligation in determining validity not to destroy but to construe it, if possible, consistently with the will of the legislature, so as to comport with constitutional limitations." *Kay v. Austin,* 621 F.2d 809, 812 (6th Cir.1980) *citing United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973).

Applying these principles to the present matter, the Court finds that the ordinance is not facially unconstitutional. First, Plaintiffs argue the YHC fails to provide for adequate notice. Section 305(b) of the YHC governs the type of notice which must be provided once a violation is found and states that the notices and orders shall contain:

1. The street address and legal description sufficient for identification of the premises and the building thereon.

2. A brief and concise statement describing the conditions found by listing violations and the section or sections of the code for reference, and an order for remedial action necessary to effect compliance with the provisions of this code.

3. Advice concerning the right of and the procedure for appeal, *except in cases of immediate hazard where emergency orders are issued pursuant to the provisions of this code.* (emphasis added).

2. (sic) A specified reasonable time for performance in order to comply as set forth in this code.

It is Plaintiffs' position that subsection Section 305(b)(3) allows inspectors to issue emergency orders without requiring them to provide advice concerning the right of and procedure for appeal. This Court disagrees.

It would be illogical to conclude that the ordinance requires advice for predeprivation process but does not require such advice for postdeprivation process. Section 305(b) mandates that notice of rights to appeal be given in all situations with the limited exception of emergency orders to vacate. It does not provide that notice of the right to appeal is to be discarded in emergency situations but, instead, should be interpreted to mean that advice concerning predeprivation appeals is unnecessary since an emergency order to vacate is immediately effective.

Accordingly, Plaintiffs' Motion for Summary Judgment on this issue is **DENIED,** and Defendants Motion for Summary Judgment is **GRANTED.**

**B. Qualified Immunity**

In this case, Plaintiffs have named Joseph Palermo ("Palermo"), Administrator of the Bureau of Building and Housing Code Administration, Frank Zarlenga ("Zarlenga"), Associate Planner and Zoning and Housing Enforcement Officer, Joseph Parise ("Parise"), Housing Inspector, and Police Officers Detective Sergeant William C. Powell ("Powell"), Officer Robert Patton ("Patton"), Robert Clark ("Clark"), Paul Brown ("Brown") of the Special Investigation Unit ("SIU"), and 24 unidentified Youngstown police officers in their individual capacity. In their Answer to Plaintiffs' Amended Complaint, all of these defendants assert that they are entitled to qualified immunity. However, only the Defendant Police Officers have moved for summary judgment on the issue of qualified immunity.[1]

Section 1983 provides a cause of action against any person, who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law. 42 U.S.C. § 1983. However, when officials are sued in their individual capacities, they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity. *See Cagle v. Gilley,* 957 F.2d 1347, 1348 (6th Cir.1992).

Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id.*

"The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred." *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 589 (6th Cir.), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994); *Silver v. Franklin Township,* 966 F.2d 1031, 1035 (6th Cir.1992). To prove that a right was clearly established a claimant can draw from either Supreme Court precedent, precedent from this court, or cases from other courts which "point unmistakably to the unconstitutionality of the conduct and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Mumford v. Zieba,* 4 F.3d 429, 432–33 (6th Cir.1993).

The Court utilizes an "objective reasonableness" standard to determine whether a government official would believe that a

1. If the issue of qualified immunity was before the Court with respect to Zarlenga and Parise it would be the finding of this Court that their actions were objectively unreasonable, and, thus, qualified immunity would not shield them from individual liability.

right is clearly established. *Long v. Norris,* 929 F.2d 1111, 1115 (6th Cir.1991). "[T]he objective reasonableness test focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law." *Id.* (citations omitted).

Individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendant's position would understand that what they were doing violates those rights. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Once disputed factual issues are resolved, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817 (2d Cir.1990).

Plaintiffs claim that the Defendant Officers of the SIU violated their Fourth Amendment rights by entering and searching their dwellings without a search warrant and without probable cause.

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. *Arizona v. Evans,* 514 U.S. 1, 6, 115 S.Ct. 1185, 1188–89, 131 L.Ed.2d 34 (1995). The Fourth Amendment not only protects criminal suspects but also limits governmental intrusions in civil contexts. *See Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967); *Flatford v. City of Monroe,* 17 F.3d 162, 169 (6th Cir.1994). Generally, a warrant is required before a search and seizure may be conducted, unless one of the exceptions to the warrant requirement exists. *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

There is an abundance of evidence that the Defendant Officers should have known that they were violating Plaintiffs' Fourth Amendment rights. Although Zarlenga casts his role with SIU as, first and foremost, a peace officer, the following recitation of the facts will evince a systematic abuse by the Defendant Officers as well as Zarlenga, of Plaintiffs' constitutional rights. That is, under the guise of entering a dwelling for the purpose of conducting housing inspections, the Defendant Officers searched Plaintiffs' premises for drugs, without the necessity of obtaining a search warrant and without probable cause.

After graduating from the Police Academy, Zarlenga began frequently requesting assistance from beat cops, and then SIU, purportedly for his own protection. As a part of the *quid pro quo* arrangement which developed, Zarlenga and Parise began accompanying the SIU on drug raids,[2] (Powell Depo. at p. 66) and Zarlenga was then permanently assigned to the SIU to serve under Powell's command. (Powell Depo. at p. 68). In fact, Zarlenga's overtime was paid out of the law enforcement fund budget upon which SIU operates. (Powell Depo. at p. 67).

Both Zarlenga and SIU would generate lists of residences, Zarlenga's list contained addresses with suspected housing code violations, while SUI's list contained addresses where suspicious activity indicated the sale of drugs. Zarlenga and SIU developed a practice of comparing lists, in order to save time, so they could go together when an address appeared on both lists. However, according to Zarlenga, it became a common practice for Zarlenga and SIU to accompany one another, even when an address appeared on only one list. (Zarlenga Depo. at pp. 41–42). Although this conduct alone is not a violation of the Fourth Amendment, the apparent predisposition to focus on drug activity, which developed from this arrangement, ultimately led the Defendant Officers to search Plaintiffs' residences solely because they were located in a particular area of the City that is known as a center for drug activity.[3] The

2. The SIU is a team of police officers whose primary function is the investigation of drug trafficking in the city of Youngstown. (Powell Depo. at p. 11).

3. When asked about the discussion which led to him becoming a member of SIU, Zarlenga states, "There were so many different SIU people who showed up to hold my hand when I called for

uncontradicted accounts which follow support this conclusion.

On August 19, 1993, Zarlenga came to Richmond's residence to conduct a housing inspection accompanied by approximately 10 to 12 officers. (Richmond Depo. at p. 16–17). While Zarlenga conducted the inspection, Powell informed Richmond among other things that "he had complaints about black people pulling in [Richmond's] driveway and staying two or three minutes and leaving" and that he thought Richmond knew "a number of black people in the drug business." [4] (Richmond Depo. at p. 18). Then Powell asked Richmond to be a drug informant and when he refused, Powell nodded at Zarlenga who immediately ordered him to evacuate the residence because of a broken soil stack. (Richmond Depo. at p. 19).

On August 27, 1997, Patton, while at Noble's residence for a housing inspection, informed him that he heard Noble was dealing drugs. Although Noble denied the accusation, Parise and the officers who had accompanied Patton entered the house without consent from Noble, who remained on the porch. When Noble insisted upon going in the house, he was forced to sit in a chair while the officers searched his home.[5] Parise subsequently ordered Noble to vacate the premises for a pinhole in the stack pipe.

On October 21, 1993, Zarlenga and three officers were admitted to Mitchell's residence for a housing inspection by her three-year old grandson. (Mitchell Depo. at p. 31). Once inside, they asked Mitchell if they could look around.[6] (Mitchell Depo. at p. 33). Mitchell acquiesced, stating in her deposition, "What was we going to do with them standing up in there but tell them it was okay?" (Mitchell Depo. at p. 33). Mitchell's residence was evacuated for a soil stack violation.

On October 6, 1993, Zarlenga and approximately three SIU officers asked Wallace to step out of her house to talk to an officer who was sitting in a blue car. Wallace agreed but needed to put on a pair of shoes. When Wallace came downstairs, Zarlenga and the officers were standing in her living room.[7] The officer in the car told Wallace that he had complaints about loud music and a lot of traffic. Wallace told the officer that there could not have been any loud music because

assistance that you could solve a lot of problems and I think it started from that." Zarlenga concludes, "I don't remember who actually made the statement, just a statement, you could get go in anywhere, for housing inspections, sure." (Zarlenga Depo. at p. 54) . . .

Q: In your discussions with Brown and Clark, did you ever talk about your ability to enter and inspect homes under the housing code as a way to assist the police department to get into homes?
A. I don't know that we ever specifically sat down and discussed that but I'm sure they knew that that could happen. We had the right to go into and inspect a specific home.
Q. Did they ever express to you some interest in accompanying you on inspections so that they would be able to get into suspected homes?
A. Yes, sure.
Q. And did they, in fact, ever do that?
A. Sure. A number of times they had asked permission to search a house that I had already entered, asked permission to enter from the owner to search.
Q. Have (sic) you aware of any situations where they didn't ask permission?
A. Never. They always asked or got them to sign something but I never did see what it was they asked them to sign. (January 20, 1995 Deposition of Frank Zarlenga at p. 76).

The Court notes that Defendants have not produced any signed documents wherein Plaintiffs consented to searches which they did not consider incidental to the housing inspection.

4. Powell said, "Van, I didn't come with a warrant but I did come to talk to you. I was talking to the other guys on the radio and I told them I thought you were a person I could come and talk to. Do you mind if we go inside and look around?" Richmond said he "had to think about that." But eventually he said, "sure, go ahead." (Richmond Depo. at p. 17).

5. Noble stated that an officer was going to open his hutch. He said, "Do you mind if I look in here?" Noble responded, "Do you have a search warrant?" The officer said, "No. Do you want me to go get one?" Noble then said, "No. Go ahead." (Noble Depo. at p. 27).

6. I asked them, "What you all doing in here?" And they said, "We come in here to inspect." I said, "Inspect what and for what?" "We just had some complaints." "Complaints about what?" They still didn't give me a straight answer about it. (Mitchell Depo. at p. 33).

7. There was no screen door and the storm door was open. However, Wallace did not invite them into the house or consent to any search of the premises.

she did not own a stereo. Also, she had only recently moved all of her belongings into the house in carloads, which might explain the traffic. Meanwhile, her brother, who was visiting at the time, reported that Zarlenga and the officers were looking around the house. When Wallace reentered the house, Zarlenga informed her that she must vacate the residence because of a broken soil stack.

This behavior by the SIU demonstrates a pattern of conduct that would lead any court to conclude that the Defendant Officers violated Plaintiffs' clearly established rights and that a reasonable officer would know that such action is unconstitutional. The Defendant Officers cannot insulate their Constitutional improprieties under the cloak of departmental cooperation. The preceding examples indicate that the Defendant Officers used the housing inspections as a method to attempt to gain apparently lawful entry into Plaintiffs' homes in order to conduct illegal drug searches.

Furthermore, the same sort of pretext was employed when SIU, accompanied by Zarlenga, visited a residence which appeared solely on the SIU list. Zarlenga states that his role on those occasions was "as a police officer, basically as a police officer because of [his] expertise for zoning and housing purposes but as a police officer first."[8] (Zarlenga Depo. at p. 35). However, Zarlenga then admits in his deposition that even when a residence appeared *solely on the Officers' list,* it was Zarlenga who would first approach the residents introducing himself as a housing inspector. Furthermore, if he met with resistance he would caution the residents that refusal to admit him would result in a minor misdemeanor violation.

At his deposition, Zarlenga stated, in pertinent part:

Q: What did you see as your role in accompanying them to a location where they thought there was drug activity?

A: I didn't look at it that way.

Q: How did you look at it?

A: I looked at it as a problem and it was my job to solve problems, solve the problem. I didn't even know what the problem was, but I wouldn't know until I got there to find out what was going on ... Obviously there is a problem in the neighborhood or they wouldn't have me involved.

Q: What did you see as the role you could play in solving that kind of problem, a drug problem that they were having at a location?

A: I was there for housing problems, not for a drug problem. I was there for housing problems, not for drug problems. And every instance, I don't recall any other, there was a problem with the living conditions or conditions of the building or complaints determining the structure, with the structure first or the people, how many people were involved and living inside the place, conditions of the yard, the condition of the kids, that's all I can recall.

Q: Could you describe for me what typically takes place when you went out after one of these meetings with SIU officers and *they* had identified a location *they* were having problems at, could you—

A: Basically it would be the same, knock on the door, identify myself, tell them who I was and why I was there.

Q: You would do that?

A: Me, yes ... (Zarlenga Depo. at p. 44) (Emphasis added) ...

Q: When you were speaking with home owners would you ordinarily identify the police officers as being with you?

A: They usually identified themselves. I don't recall doing that.

Q: Or even identifying them, saying these are police officers?

A: They would question, who are these guys and I would tell them, in most cases they would ask who are these guys and I would tell them.

8. Q: How did you get the understanding that your primary role was going to be that of a peace officer during the evening hours with the SIU?

A: Basically came from Romero.

Q: What did Mr. Romero tell you?

A: Basically, you are a cop, you are going with these guys as a cop. Now, if you have to turn into a housing inspector because of a critical problem, an emergency life threatening problem, then you do what you are supposed to do. (Zarlenga Depo. at p. 36).

Q: You would tell them what?

A: They are police officers.

Q: Did you ever identify yourself as a police officer?

A: Not that I can recall. I identified myself as a housing inspector or zoning. (Zarlenga Depo. at p. 47) ...

Q: Did you tell the occupants that they had to let you in?

A: In most cases I explain to the occupants that if they did not allow me to go in, I would have to issue a citation or let them know this is just a quick housing inspection for the physical structure, if they had a problem with it to say so but I would have to come back ...

Q: And the citation you referred to if they didn't let you in was what citation?

A: Minor misdemeanor.

Q: Under what authority?

A: Under the housing code. (Zarlenga Depo. at p. 46).

Furthermore, the facts belie the Defendant Officers' claim that certain searches were consensual. "The burden of proving that the consent was, in fact, freely and voluntarily given cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968). The depositions indicate that Plaintiffs were led to believe that the Officers' presence within the residence and the searches that followed were pursuant to the lawful power of Zarlenga and the Housing Administrative Code to enter and conduct inspections.

Since the evidence cannot support a finding that, at the time the Defendant Officers entered the Plaintiffs' premises, they had facts within their knowledge sufficient to warrant a prudent man in believing that plaintiffs had committed a crime, *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the Court finds that the Defendant Officers violated Plaintiffs' Fourth Amendment rights. Further, as the evidence has confirmed that these inspections were a pretext for conducting warrantless searches for drugs without probable cause, the Defendant Officers should have known that their conduct was unconstitutional. Hence, the Court finds Defendant Police Officers are not entitled to qualified immunity.

**The Fourteenth Amendment**

1. *Procedural Due Process*

The Supreme Court has held that due process requires notice and a hearing prior to eviction. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). There are, however, "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after [eviction]." *Id.* at 82, 92 S.Ct. at 1995. "A prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a government official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." *Flatford v. City of Monroe,* 17 F.3d 162, 167 *citing Fuentes,* 407 U.S. at 91, 92 S.Ct. at 1999–2000.

The Youngstown Housing Code provides:

> (b) emergency orders to vacate are issued where in the opinion of the CEO an emergency exists and immediate action is necessary to protect the health, safety and welfare of the oxxupants (sic) or public. Notwithstanding other provisions of this code, the order shall be effective immediately and complied within the time and manner prescribed in the emergency order.

Ordinance No. 85226 § HC–311(b). It is pursuant to this ordinance that Zarlenga and Parise issued the orders to vacate without affording Plaintiffs a predeprivation process. Thus, it must be determined whether there existed some extraordinary situation which demanded prompt action to secure an important government interest.

While it is clear that an emergency eviction from one's residence is a significant intrusion, circumstances may exist which make such action both justifiable and necessary. "However, where the need to protect lives is the basis for such an intrusion, government officials should not be made to hesitate in performing their duties, particularly where postdeprivation remedies can immediately

correct any errors in judgment." *Flatford,* 17 F.3d at 167.

Presently the Court need not address the issue of predeprivation since the parties have not raised it in their respective motions. However, Plaintiffs request summary judgment with regard to the deprivation of property without the due process of a postdeprivation appeal.

In instances where there has been a deprivation of property, the due process clause may be satisfied if a "suitable postdeprivation remedy" is provided by the state. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). A postdeprivation remedy is suitable if it provides an opportunity to be heard at a meaningful time and in a meaningful manner, though the timing and the nature of this hearing depends upon the nature of the individual circumstances. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433–34, 102 S.Ct. 1148, 1156–57, 71 L.Ed.2d 265 (1982).

The Sixth Circuit has stated the following in regard to postdeprivation process as it pertains to emergency evacuation orders:

> Because in many cases emergency evacuees may determine there is no need for administrative review, we cannot say that an automatic hearing is constitutionally required. However, fundamental fairness requires notice in short order of the right to an administrative hearing, including the manner designated for obtaining timely review ... The requirement of an immediate and meaningful postdeprivation process becomes even more important in view of the license which qualified immunity essentially allows public officials when they make judgments affecting the health and safety of our citizens under perceived exigent circumstances. Even though we recognize that these judgments may be mistaken, the opportunity of an administrative hearing assures that fairness will quickly prevail and that constitutional rights, if mistakenly curtailed, will be immediately restored. Without the assurance of immediate review, qualified immunity may be wrongly perceived as an open invitation for public officials to ignore fundamental rights without any fear of censure. This is most certainly not our intended message.

*Flatford,* 17 F.3d at 169.

Section 305(b) of the YHC is explicit in that notices of violations shall contain a list of information including "[a]dvice concerning the right of and the procedure for appeal." Although it provides a limited exception to predeprivation notice in emergency situations, Section 305(b) provides that post deprivation appeals are available. As the YHC is clear that this list of information should be written, therefore, this Court need only review whether an issue exists regarding Defendants' compliance with the YHC.

Plaintiffs allege that they never received any notice of their right to appeal. Defendants Zarlenga and Parise admit that they only issued verbal notices. (Zarlenga Affidavit; Parise Affidavit) Since, verbal notices do not satisfy the requirements of the YHC, Defendants Zarlenga and Parise, by their own admissions did not comply with the ordinance and afford the Plaintiffs the appropriate due process.

Accordingly, Plaintiffs' Motion for Summary Judgment on this issue is **GRANTED.**

2. *Substantive Due Process*

Plaintiffs allege that Defendants violated their rights to substantive due process by entering and searching plaintiffs' dwellings and issuing emergency orders to vacate when no emergency existed. They further allege that the housing inspections would serve as a false pretense for drug raids by the police.

Defendants contend that there is no evidence to suggest that their actions were arbitrary or capricious and ask for summary judgment. Although disagreeing with the Defendants' assertions, the Court grants summary judgment because Plaintiffs' reliance on substantive due process in Count IV is misplaced.

In *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Court held that "where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular source of government behavior, 'that Amend-

ment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims'." *Id.* at 273, 114 S.Ct. at 813 *quoting Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Therefore, a substantive due process analysis generally may not be employed absent a showing of governmental interference with a fundamental constitutional right such as matters relating to marriage, family, and procreation. *Albright,* at 272, 114 S.Ct. at 812.

In this case, the housing inspections conducted under false pretenses and warrantless searches are not appropriately addressed by substantive due process. Rather, such conduct is actionable under the Fourth Amendment.

Accordingly, Defendant's Motion for Summary Judgment on Count IV is **GRANTED.**

### D. Conspiracy

Plaintiffs allege in Count V of the Complaint that the Defendants conspired to deny and deprive them of their constitutional rights. Although Plaintiffs do not expressly state so in their Complaint, Defendants interpret and respond to this Count as if brought as a conspiracy claim under the Civil Rights Act, 42 U.S.C. § 1985(3).

Defendants' contend that Plaintiffs' conspiracy claim is barred by the intra-corporate conspiracy theory. This theory states, in pertinent part:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Education,* 926 F.2d 505, 509 (6th Cir.1991).

Defendant argues that all of the individual defendants are employees or agents of Youngstown and that under the intra-corporate conspiracy theory, they could not have deprived Plaintiffs of civil rights. Therefore they request summary judgment on this matter.

Defendants' argument is misplaced. An exception exists to above rule. Employees and agents of a company, or in this case, municipality, are not protected under this theory when their challenged activity takes place outside the scope of their employment. *Johnson v. Hills & Dales General Hospital,* 40 F.3d 837, 838 (6th Cir.1994). The deposition records sufficiently indicate that Defendants may have been acting outside the ordinary course of their employment. Therefore, a genuine issue of material fact exists with regard to Plaintiffs' conspiracy claim. Accordingly, Defendants' Motion for Summary Judgment on this issue is **DENIED.**

### E. State Claim

In Count VI of their complaint, Plaintiffs allege that Defendants violated the Youngstown Housing Code. However, as Defendants correctly assert, Count VI does not state a cause of action. Defendants' Motion for Summary Judgment on Count VI is more appropriately addressed under Fed.R.Civ.P. 12(f).

All allegations of the complaint must be treated in the light most favorable to the Plaintiff. *See Miree v. DeKalb County,* 433 U.S. 25, 27 n. 1, 97 S.Ct. 2490, 2492 n. 1, 53 L.Ed.2d 557 (1977); *Sinay v. Lamson & Sessions,* 948 F.2d 1037, 1039 (6th Cir.1991). Although their allegations are construed in the most favorable light, Count VI of Plaintiffs' Complaint does not state a cause of action and should, therefore, be stricken from the pleading.

Accordingly, Count VI of Plaintiff's Complaint is **STRICKEN.**

## *III. CONCLUSION*

Based upon the foregoing reasons, the Court finds that there are no genuine issues of material fact and that Plaintiffs are entitled to judgment as a matter of law. Accordingly, Plaintiffs' and Defendants' Motions for Partial Summary Judgment are both **GRANTED** in part, and **DENIED,** in part. Additionally, Count VI is **DISMISSED** as a matter of law.

**IT IS SO ORDERED.**

JUDGMENT

For the reasons stated in the attached Memorandum Opinion, **JUDGMENT** on Count I of the Complaint as it pertains to Plaintiffs' right to a postdeprivation hearing is **GRANTED** for the Plaintiff and **JUDGMENT** on Counts IV and VI of the Complaint is **GRANTED** for the Defendant.

**IT IS SO ORDERED.**