Margo Jacenta COLLINS–DRAINE, Jodie Trenise Draine, LaDelmar Dewayne Draine, a minor by his mother and next friend, Margo Jacenta Collins–Draine, Plaintiffs–Appellants,

v.

Richard KNIEF, individually and in his capacity as a police officer for the City of Waterloo, Iowa, and City of Waterloo, Iowa, Defendants–Appellees.

No. 98–789.

Court of Appeals of Iowa.

July 26, 2000.

Thomas P. Frerichs of Frerichs Law Office, P.C., Waterloo, for appellants.

Ivan T. Webber of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellees.

Heard by SACKETT, C.J., and STREIT and VAITHESWARAN, JJ., MAHAN, J., takes no part.

STREIT, J.

The rule of law places restraints on individuals and governments alike. This is a fragile balance to maintain, because individuals and governments must abide by the restraints of a structure of laws. One such restraint is the constitutional protection of our people to be free from seizure by the police. In 1993 Jodie Draine, her mother Margo Collins–Draine, and her brother LaDelmar Draine were detained for a number of hours at the Waterloo police station to prevent them from tipping off some acquaintances about an impending drug raid. The family brought a civil suit under 42 U.S.C. § 1983, claiming a violation of their constitutional rights under the Fourth Amendment. The trial court dismissed their claim, finding their detention did not offend any constitutional prescriptions. We reverse the trial court as it applied incorrect law and did not make factual findings supported by substantial evidence.

## I. Background Facts & Proceedings.

In the autumn of 1993 Margo permitted some friends of her daughter to stay at her home in Waterloo. The friends were allegedly caught up in drug and gang activity in Colorado and were looking for a fresh start. Upon moving in, however, it appeared the guests could not put their pasts behind them, and they began dealing in narcotics. Based on tips from confidential informants, the Waterloo police department obtained and executed a search warrant for the Collins–Draine home. They only found a small amount of marijuana. Tired and embarrassed, Margo asked her daughter's friends to leave. They rented two rooms in a local Waterloo hotel accompanied by one of Margo's daughters, LaNitra.

Approximately ten days later, Waterloo police officer Richard Knief was told by fellow officers about the raid of the Collins–Draine home, the suspected traffickers' move to the hotel, and reports from confidential informants that drug sales were occurring at the hotel. Knief, stepping up his patrol in the area, kept a sharp eye out for cars with out-of-state license plates. One evening on a pass through the hotel parking lot, Knief spotted the car of Jodie Draine, Margo's other daughter. Knief watched the vehicle. When Jodie and her boyfriend, Billy Trotter, left the hotel around 10 p.m., Knief stopped the

vehicle and asked if he could search the car. Permission was granted, but the officer found nothing illegal. Nevertheless, Officer Knief told Jodie and her boyfriend they needed to come to the police station. Knief took Jodie's keys and registration, moved her vehicle off the road, placed both parties in the squad car, and took them to the station.

Meanwhile, Margo, a social worker for the department of human services, heard about the stop of her daughter over a police scanner. She immediately left for the police station with her fifteen-year-old son, LaDelmar. When she arrived at the police station, Margo spoke with her daughter about the events leading up to her present predicament. Officer Knief asked Margo about the alleged drug activity occurring at the hotel. Margo denied any knowledge of any illegal activity and rose to leave. Officer Knief told both Margo and her son they could not leave as he was attempting to procure a search warrant for the hotel rooms and he feared Margo or her son would warn the hotel occupants of the impending search.

The warrant was executed around 1 a.m. Shortly thereafter, Margo and LaDelmar were permitted to leave. The police held them approximately three hours. The search of the rooms failed to reveal any evidence of high-volume drug trafficking. The sole evidence of illegal activity was the remnants of a single marijuana cigarette. Despite the complete absence of any evidence tying Jodie to any illegal activity, she was not released until 4 a.m.—a period of six hours.

Jodie, Margo, and LaDelmar filed suit alleging their constitutional rights under the Fourth Amendment were denied under the color of law in violation of 42 U.S.C. section 1983 and they were falsely arrested under common law. Upon trial to the bench in 1998, the district court dismissed the plaintiffs' claims finding the seizure was reasonable to prevent notification of the impending search.

Jodie, Margo, and LaDelmar appeal, claiming the trial court erred in finding their respective detentions constitutionally permissible. This case was transferred to the Court of Appeals in April 2000.

## II. Standard of Review.

■ We review law actions tried to the district court for correction of errors at law, and the court's findings of fact have the effect of a special verdict. Iowa R.App.P. 4; *Data Documents, Inc. v. Pottawattamie County*, 604 N.W.2d 611, 614–15 (Iowa 2000). Thus, all findings of fact are binding if supported by substantial evidence. Iowa R.App.P. 14(f)(1); *Data Documents, Inc. v. Pottawattamie County*, 604 N.W.2d at 614–15. "Evidence is substantial if a reasonable mind could accept it as adequate to reach the same findings." *Bluffs Dev. Co. v. Board of Adjustment*, 499 N.W.2d 12, 14 (Iowa 1993). In applying this standard, we view the evidence in a light most favorable to upholding the district court's judgment. *Data Documents, Inc. v. Pottawattamie County*, 604 N.W.2d at 615.

## III. Claims under 42 U.S.C. § 1983.

■ In order to support a claim of damages under 42 U.S.C. § 1983, Margo and her family must show Officer Knief (1) deprived them of a right, privilege, or immunity secured by the United States Constitution, and (2) was acting under the color of state law at the time of the deprivation.[1] *See Bailey v. Lancaster*, 470 N.W.2d 351, 356 (Iowa 1991). There is no question Officer Knief was operating under the color of state law. The sole question before us is whether a constitutional

---

1. 42 U.S.C. § 1983 (1994) provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

deprivation occurred. Jodie, Margo, and LaDelmar contend Officer Knief's actions violated their clearly established constitutional right to be free from unreasonable seizures under the Fourth Amendment.

 The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure in their persons from unreasonable government seizures. U.S. Const. amend. IV. Traditionally, any deprivation of a person's liberty without a warrant issued by a neutral and detached magistrate was considered presumptively unreasonable. *State v. Canas,* 597 N.W.2d 488, 492 (Iowa 1999). With time, however, that ironclad presumption became riddled with exceptions whereby the courts found certain seizures did not run afoul of the Constitution, given the inherent reasonableness of the officer's actions under the circumstances. *Id.* Among those exceptions carved from the Fourth Amendment is the situation where an officer is permitted to briefly stop and detain an individual for investigatory purposes, if there exists a reasonable and articulable suspicion the person is intending to or just committed a criminal offense. *Terry v. Ohio,* 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968). Such a detention, however, should generally be brief with the officer making diligent efforts to quickly confirm or refute the suspicion. *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615–16 (1985). If, however, the officer exceeds the bounds of the investigatory stop, the seizure transforms into a full-fledged arrest, which must then be supported by probable cause. *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 590 (6th Cir.1994). The bounds of an investigatory stop are exceeded if the officer unnecessarily holds the suspect or transports the suspect to the police station. *United States v. Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575, 84 L.Ed.2d at 615 ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop."); *Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705, 710 (1985) (the full protection of the Fourth Amendment is triggered "when the police without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station."). Although *Terry* stops are permissible under the Constitution, there has been no judicially-created exception to the Fourth Amendment that permits law enforcement officials to seize people so as to prevent them from warning suspects of police monitoring. We respectfully note officers place their lives in harm's way on a regular basis; however, neither the Fourth Amendment nor its exceptions permit officers to dismiss these constitutional mandates solely because of safety concerns.

We now turn to the individual claims of the appellants. Given the differing circumstances surrounding Jodie's detention versus the detention of Margo and LaDelmar, we address their claims separately.

 **A. The Detention of Jodie.** At the outset we must determine if the initial *Terry* stop of Jodie was supported by reasonable suspicion. To meet the reasonable suspicion standard, an officer must be able to articulate something more than an inchoate and unparticularized hunch. *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 308 (1990). Officer Knief said he stopped Jodie's car to see if the occupants were trafficking drugs because they may have been associated with the hotel group. His suspicions were based upon the following information: (1) the drug raid conducted at the Collins–Draine home, (2) the alleged traffickers moved to this particular hotel, (3) they were believed to be selling drugs from the hotel, and (4) the license plate of a car in the hotel lot was registered to Jodie Draine. What Officer Knief did not know was: (1) if Jodie was involved in drug activity, (2) the identity of the two people in the vehicle, (3) what hotel room the car's occupants had been in, or (4) the length of time the vehicle was parked in the lot. Officer Knief had information that

may have supported an investigatory stop of someone leaving the hotel room in question. However, when juxtaposed against the unanswered questions of who these people were, what room they had come from, how long they had stayed, or what they did, articulable suspicion begins to shrink dangerously close to a mere hunch—for simply leaving a hotel complex where believed drug traffickers are operating does not grant an officer the unfettered authority to stop any individuals leaving the hotel. *See United States v. Crawford*, 891 F.2d 680, 682–83 (8th Cir. 1989). Although we do not find this to be a compelling case of reasonable and articulable suspicion—in fact, it appears more akin to a journey of exploration—in viewing the evidence most favorably to upholding the court's judgment we cannot say the findings are patently unreasonable. The initial stop therefore is upheld.

If the stop is valid, however, the officer must still take steps calculated to quickly dispel or confirm the suspicion. If the officer's suspicions are dispelled, the detainee must be released. *See Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984). In the present case, Officer Knief searched Jodie's vehicle. The search uncovered no evidence of any criminal activity. Officer Knief's suspicions should have been dispelled and Jodie released. Any additional detention was no longer justified as a *Terry* stop, nor was there probable cause for an arrest. As Officer Knief's continued seizure of Jodie's person was without constitutional authority, his actions constituted a violation of Jodie's Fourth Amendment right to be free from unreasonable seizures.

Even if Officer Knief's suspicions were not adequately quelled, his subsequent actions of removing Jodie from the scene and transporting her to the police station transformed the brief investigatory stop into an arrest. *See Hayes v. Florida*, 470 U.S. at 816, 105 S.Ct. at 1647, 84 L.Ed.2d at 710 (the full protection of the Fourth Amendment is triggered "when

the police without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station."); *Centanni v. Eight Unknown Officers*, 15 F.3d at 590. The district court found Jodie consented to going to the police station. This conclusion is not supported by substantial evidence. The record is completely void of any evidence Jodie willingly went to the police station. She was told she needed to come to the station, was placed in the back of a squad car, and her car keys and registration were taken from her. The only conclusion, based on the evidence, is Jodie was involuntarily taken to the police station, thus dashing any remaining remnants of an investigatory stop and turning it into an arrest not supported by probable cause.

The present case is strikingly similar to *Centanni v. Eight Unknown Officers*, 15 F.3d 587 (6th Cir.1994). In *Centanni*, officers were watching the home of a shooting suspect, when Centanni left the residence. *Id.* at 588. The officers detained her, searched her, brought her to the police station, interrogated her, and then held her for four hours until they were able to effectuate the suspect's arrest. *Id.* at 589. Centanni was not involved with the shooting. *Id.* The Sixth Circuit held the officers' actions constituted a violation of Centanni's constitutional rights as there was no exception to the Fourth Amendment permitting the indefinite holding of an innocent party in order to prevent the possibility of forewarning the suspect. *Id.* at 590–91. The court further found Centanni's prolonged detention was not one of the " 'narrowly defined intrusions' contemplated by *Terry* [as] there is no such thing as a *Terry* 'transportation.' " *Id.* at 591.

Even if we were to assume the officer's suspicions were not dispelled or Jodie voluntarily went to the police station, her detention at the police station for a minimum of five hours was clearly not the brief investigatory stop contemplated by *Terry*. *United States v. Sharpe*, 470 U.S.

at 686, 105 S.Ct. at 1575, 84 L.Ed.2d at 615. The search of the hotel rooms was conducted between 1:00 and 1:30 a.m. The search turned up a small amount of marijuana attributed to one of the men from Colorado. Nevertheless, Jodie continued to be restrained for an additional three hours. Such restraint served no legitimate purpose.

The City points to *Michigan v. Summers* in asserting people may be detained to prevent warning others of an impending search. *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). *Summers* only permits officers who hold a valid search warrant to briefly detain occupants of the premises while the search is conducted. *Id.* at 705, 101 S.Ct. at 2595, 69 L.Ed.2d at 351. The rationale in granting such an exception was fourfold. First, the officers would be armed with a warrant issued by a neutral and detached magistrate—thus eliminating the risk of officers acting outside the bounds of the Constitution. *See id.* at 701, 101 S.Ct. at 2593, 69 L.Ed.2d at 349. Second, the detention would occur in the detainee's own residence, which "could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702, 101 S.Ct. at 2594, 69 L.Ed.2d at 349. Third, there exist such exigencies as possible flight and officer safety. *Id.* Finally, detention may add to the orderly completion of the search as the occupant may be able to unlock doors or open locked containers. *Id.* at 703, 101 S.Ct. at 2594, 69 L.Ed.2d at 350.

*Summers* could not be more inapposite to the present case. Jodie was not detained pursuant to a validly obtained search warrant; there was no evidence she was an "occupant" of the hotel room; and the detention occurred at the police station, was not brief, and did not add to the orderly execution of the warrant. *See Centanni v. Eight Unknown Officers,* 15 F.3d at 591. The only factor cited in *Summers* that supports her detention was

the threat she may warn the occupants of the impending search. However, Jodie would not have even learned of the officers' intention to search the hotel rooms if not for her unjustified detention and interrogation. We cannot sanction an officer to create, either intentionally or mistakenly, an artificial justification for detaining citizens contrary to the Fourth Amendment by merely notifying them of their intent to procure a search warrant. Permitting such an exception would not only be counterintuitive but contrary to the protections embodied by the Fourth Amendment.

The trial court erred both in its conclusions of law and in its findings of fact. Jodie's six-hour detention was not a reasonable *Terry* seizure, nor can it be construed as permissible under *Michigan v. Summers.*

**B. The Detention of Margo and LaDelmar.** The justifications cited for detaining Jodie's mother and brother at the police station are unpalatable. There is no indication Margo or her son were in any way suspected of any criminal wrongdoing. They arrived at the police station to check on a family member. They were engaged in no suspicious activity. There was no indication they would notify the alleged drug dealers of the police activities. Our previous analysis sufficiently details when an officer may detain individuals pursuant to *Terry* or *Summers.* The detention of Margo and LaDelmar, without justification, was a violation of constitutional rights.

The district court intimated the detention of Margo and LaDelmar did not amount to a constitutional violation, given its brevity. First and foremost, being detained approximately three hours for no legally recognizable purpose could hardly be described as a mere moment in time. Additionally, the Fourth Amendment does not permit unreasonable seizures as long as they are considered brief. The brevity of their detention is a matter to be addressed in the award of damages. The

trial court erred in finding no constitutional violation.

## IV. *Conclusion.*

In dismissing the claims of the Collins–Draine family, the trial court erred in applying established Fourth Amendment principles and in making factual conclusions not supported by substantial evidence. We therefore reverse and remand the case to the trial court for a finding in conformance with the law and the evidence. As the trial court did not reach damages, the appellants' false imprisonment claim, or the City's liability under the theory of *respondeat superior,* we direct the court to consider these issues.

**REVERSED AND REMANDED.**