**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dion HOPSON, Defendant–Appellant.**

No. 02–4387.

United States Court of Appeals,
Sixth Circuit.

May 20, 2004.

David J. Bosley, U.S. Attorney's Office, Columbus, OH, for Plaintiff–Appellee.

Dennis C. Belli, Columbus, OH, for Defendant–Appellant.

Before ROGERS and COOK, Circuit Judges, and SCHWARZER, District Judge.*

ROGERS, Circuit Judge.

A pair of men robbed an employee of Sanese Services, a vending machine company, as he was servicing vending machines at Calltech Communications in Columbus, Ohio. A jury convicted Dion Hopson, the defendant-appellant, of robbery and carrying and brandishing a weapon during a crime of violence in connection with this crime, and of making a false statement to a federally licensed firearms dealer. On appeal, Hopson raises a number of claims, most notably that his confession to the robbery was admitted in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that the district court improperly instructed the jury, and that the district court improperly applied a sentencing enhancement for a leadership role in the robbery. For the reasons discussed below, we affirm Hopson's conviction but reverse the application of the sentencing enhancement for a leadership role in the robbery.

## BACKGROUND

On June 4, 2000, Dion Hopson purchased three firearms from the Peddler's Post, a federally licensed firearms dealer located in Wilmington, Ohio. As part of the transaction, Hopson completed ATF Form 4473, the Firearms Transaction Record, as required by federal law. He answered "no" to the question, "are you under indictment or information in any court for a crime for which a judge could imprison you for more than one year?" At the time, Hopson was under indictment in Franklin County, Ohio, for the felony crime of carrying a concealed weapon.

On November 1, 2000, Hopson was hired as a vending route driver by Sanese Services ("Sanese"), a vending machine and catering business located in Columbus, Ohio. Vending route drivers service the vending machines on their routes and collect money generated by these machines. As part of his route, Hopson serviced the vending machines at Calltech Communications ("Calltech"), located in the northwest area of Columbus. On December 12, 2000, Sanese fired Hopson for attempting to steal approximately $1,000.

On March 27, 2001, three armed, masked men robbed Sanese. The men entered the Sanese building and proceeded to the area where money from second-shift delivery trucks—Hopson's former shift—was kept. The largest of the men instructed the security guard to come out of his cage and unlock the gate to the room where the money was stored. Most of the robbery was captured by a security camera.

On October 8, 2001, a second-shift delivery truck was robbed as the driver was servicing the vending machines at Calltech. Prior to the robbery, at around 5:00 p.m., when the Sanese truck usually arrived, David Lock, a Calltech employee, observed a black man sitting near the smoking tent. Lock thought this was "odd" as the man was not a Calltech employee.

At around 7:15 p.m., approximately two hours behind schedule, the Sanese truck

* The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

arrived at Calltech. The driver, Justin Edwards, noticed a "kind of tall" black man near the smoking tent. Edwards made his first trip into the Calltech building and, upon returning to his truck, noticed that the man was talking on his cell phone. After making two additional trips into the Calltech building, Edwards entered the back of his truck. Then the man who had been sitting near the smoking tent jumped up on the lift gate of the truck, flashed a gun, and took the money that was in the back of the truck. During these events, the robber's gun accidentally fired.

Lock, who was taking another smoking break at the time, witnessed the robbery. The man whom Lock had noticed earlier fired a shot over Lock's head and then entered the back of the Sanese truck. Immediately thereafter, a champagne-colored van pulled up next to the Sanese truck, and a black man exited. The first robber, who was in the Sanese truck, handed bags of money to the second robber, the driver of the van. At this point, Lock ran, and, during his flight, he heard a second gunshot.

On October 17, 2001, agents of the Bureau of Alcohol. Tobacco and Firearms (the "ATF") and officers of the Columbus Police Department executed a search warrant at Hopson's residence. The agents knocked on the front door of the residence with their weapons drawn. Hopson answered, and the agents instructed Hopson to unlock the door and step away. Hopson complied, and the agents entered the living room, instructed Hopson to lie on the floor, and then handcuffed Hopson. Hopson's wife entered the living room, and the agents had her lie on the floor and handcuffed her as well. After the agents made sure that no one else was in the house, they moved Hopson to the kitchen, and situated his wife on the couch in the living room.

Craig Brenneman, an ATF agent, placed the ATF Form 4473 that Hopson had completed for the Peddler's Post in front of Hopson. Brenneman then informed Hopson that he was not under arrest. Nonetheless, he read Hopson his *Miranda* rights, and Hopson acknowledged that he understood his *Miranda* rights. Soon thereafter, the agents asked Hopson whether there was another place they could talk given the "commotion upstairs." Hopson suggested the basement. In the basement, the agents questioned Hopson, still in handcuffs, about the Sanese robberies. According to Hopson, Brenneman informed Hopson that "it's better off to cooperate with [Brenneman] because he has a good relationship with the prosecutor."

Eventually, Hopson confessed to involvement in both robberies. At first, he denied any knowledge of the March 27 robbery. After further questioning, however, he admitted that he drew a map of the interior of the Sanese building for the three men who committed the robbery, and that he accepted $1,000 of the proceeds afterwards, though he claimed that he did not know about the robbery until after it happened. Likewise, he initially denied any involvement in the October 8 robbery, insisting that he was at his son's football practice at the time of the crime. After further questioning, however, he confessed to the robbery. He stated that he had informed his accomplice when the Sanese truck would arrive and where the money would be stored, and that the pair planned to have the accomplice steal the truck itself. On the afternoon of the robbery, he dropped his accomplice off at Calltech and parked across the street. But after the Sanese truck failed to arrive on time, he decided to call off the robbery, and he drove back toward Calltech. He saw his accomplice walking back from Calltech, and he attempted to wave his

accomplice back. At this point, though, his accomplice turned around, fired a shot, and commenced the robbery. Hopson then pulled up next to the Sanese truck, transferred bags of money from the Sanese truck to his van, and fled with his accomplice.

During their search of Hopson's residence, the agents seized a Glock 40 caliber pistol. which, according to ballistics testimony from the Government, was used in the October 8 robbery, and coins in wrappers unique to Sanese.

A grand jury returned a five-count indictment charging Hopson with felony firearms and Hobbs Act violations. Specifically, the indictment charged Hopson with the following offenses: (1) Making a False Statement to a Federally Licensed Firearm Dealer in violation of 18 U.S.C. § 924(a)(1)(A) in connection with Hopson's purchase of firearms from the Peddler's Post; (2) a Hobbs Act[1] violation pursuant to 18 U.S.C. §§ 1951 and 2 in connection with the March 27 robbery; (3) Carrying and Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), and 2 in connection with the March 27 robbery; (4) a Hobbs Act violation pursuant to 18 U.S.C. §§ 1951 and 2 in connection with the October 8 robbery; and (5) Carrying and Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), and 2 in connection with the October 8 robbery. Hopson eventually pled guilty to Count 1.

Before the trial on the other counts, Hopson moved to suppress his confession to the robberies, arguing that he was not timely advised of his *Miranda* rights and that his waiver of his *Miranda* rights was not knowingly, voluntarily, or intelligently made. The district denied his motion, finding that agents properly advised Hopson of his *Miranda* rights and that Hopson knowingly, voluntarily, and intelligently waived his rights.

A jury convicted Hopson on Counts 4 and 5, which involved the October 8 robbery, but acquitted Hopson of Counts 2 and 3, which involved the March 27 robbery. The district court denied Hopson's motion for judgment of acquittal, which asserted that recent Commerce Clause decisions by the Supreme Court had altered the interstate nexus element of the Hobbs Act, and that the Government had failed to satisfy this element as presently construed. At the sentencing hearing, the district court overruled Hopson's objection to an enhancement pursuant to U.S.S.G. § 3B1.1(c) for Hopson's alleged role as an "organizer, leader, manager, or supervisor" of the October 8 robbery. Hopson timely appealed.

## ANALYSIS

### 1. Miranda *Issues*

■ Hopson advances a trio of *Miranda*-related claims, none of which is meritorious. When this court reviews a district court's denial of a motion to suppress evidence, the district court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo. *United States v. Cole*, 315 F.3d 633, 636 (6th Cir.2003).

---

1. The Hobbs Act reads as follows:
   Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
   18 U.S.C.A. § 1951(a)(2000). Section 2 of Title 18 provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C.A. § 2(a)(2000).

"Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been [apprised] of the constitutional right against self-incrimination and has validly waived this right." *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The warning must reasonably convey to a suspect his rights under *Miranda*, though no "precise formulation" or "talismanic incantation" is required. *Duckworth v. Eagan*, 492 U.S. 195, 202–03, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)). In determining whether a suspect who has received a *Miranda* warning has validly has waived these rights, a court should consider the following factors:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if "the totality of the circumstances surrounding the investigation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, including the background, experience, and conduct of the accused." *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir.2000) (internal

quotation omitted). The Government bears the burden of proving the voluntariness of the waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir.2002).

In denying Hopson's motion to suppress, the district court concluded that Hopson voluntarily and intelligently waived his *Miranda* rights before confessing to his involvement in the Sanese robberies. The court determined that Hopson was "in custody," as "[h]e was handcuffed, and there is nothing in the record that would indicate that he could simply walk away." However, the court noted that "[t]here is no dispute ... that the *Miranda* warning was given in full by Agent Brenneman to the defendant," and it concluded that Hopson fully understood his rights before waiving them. The court also found that

> there was no evidence of any coercion in this case. There is no question that the defendant was handcuffed. But that fact alone simply means that he was in custody. Beyond that, there was no other indication of any type of intimidation, no testimony that any threats were made.

In sum, "looking at the totality of the circumstance," the district court determined that "the defendant understood the *Miranda* warning and made a knowing and voluntary relinquishment of any rights that he might have had by giving a statement that he made to the detective and to the agent from the Bureau of Alcohol, Tobacco and Firearms."

*A. The Completeness of the* Miranda *Warning*

For the first time on appeal.[2] Hopson contends that the *Miranda* warning ad-

---

**2.** *See* J.A. at 83 (trial judge stating at suppression hearing that "[t]here is no dispute, both the defendant and the two officers or agents who have testified agree, that the *Miranda*

ministered to him was inadequate in that he was not specifically advised that he had a right to consult with counsel prior to custodial interrogation and to have counsel present during the interrogation. The district court did not commit plain error by failing to spot this alleged deficiency.

As Hopson stresses. the Supreme Court held in *Miranda* that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." 384 U.S. at 471, 86 S.Ct. 1602. However, the Court has "never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth*, 492 U.S. at 202, 109 S.Ct. 2875, and it has eschewed any "precise formulation" or "talismanic incantation." *Prysock*, 453 U.S. at 359, 101 S.Ct. 2806. Rather, the inquiry is simply whether the warning given to the suspect "touched all of the bases required by *Miranda*," including his right to speak to an attorney before and during questioning. *Duckworth*, 492 U.S. at 203, 109 S.Ct. 2875.

It is true that the agents did not testify specifically that they informed Hopson that he had a right to an attorney before and during questioning. *See* J.A. at 79–80 (testimony of Agent Brenneman that he "read [Hopson] his rights" and informed Hopson "that he had a right to an attorney, and if he couldn't afford one, that one would be appointed for him"); J.A. at 74–75 (testimony of a Columbus police officer that Agent Brenneman "did a standard Constitutional rights notification" and that Hopson was informed that "he had the right to a lawyer"); *see also* J.A. at 69 (testimony of Hopson that Agent Brenneman "read me my rights"). However, Hopson did not raise this alleged omission in moving to suppress his confession, and he did not respond when the Government

asserted that "[t]he defendant does not dispute ... that he was given his rights" (R. 48; Tr. Suppress. Hr'g at 50) or when the district court stated that "the defendant ... agree[s] that the *Miranda* warning was given in full" (J.A. at 53). Thus, the district court reasonably inferred from Hopson's and the agents' testimony that Hopson received a complete *Miranda* warning, and it did not plainly err by failing to explore *sua sponte* the adequacy of the *Miranda* warning.

*United States v. Tillman*, 963 F.2d 137 (6th Cir.1992), upon which Hopson relies, is distinguishable. In that case, the defendant and his accomplice were advised, according to the testimony of the interrogating officer, that

They had the right to remain silent, the right to the presence of an attorney if they so wish, they are not required to answer any questions and if they decide to answer questions they can stop and do so, and if they cannot afford an attorney one will be appointed before they answer any questions.

*Id.* at 140. This court held that this warning was inadequate because of the "dangerous omission" of "perhaps the most critical" element of a *Miranda* warning—a warning that any statements made by the defendant could be used against him. *Id.* at 141. The court noted "[i]n addition" that "the police failed to convey to defendant that he had the right to an attorney both before, during and after questioning." *Id.* Unlike in the present case, however, the defendant apparently raised the adequacy of the *Miranda* warning in the district court. Where the defendant did not object to the asserted omission, the Government was in no position to elicit further testimony as to the completeness of the *Miranda* warning. *Tillman* does not support the proposition that a district court

warning was given in full by Agent Brenneman to the defendant").

commits plain error by failing to inquire into the adequacy of a *Miranda* warning even though the defendant concedes that the warning was sufficient.

### B. Voluntariness of Hopson's Waiver of his Miranda Rights and his Confession

█ The district court's finding that Hopson voluntarily waived his *Miranda* rights and confessed to the robberies was not clearly erroneous. Hopson argues that the agents "created an inherently coercive atmosphere" by confronting his wife with a rifle and handcuffing her, by separating him from his wife by moving him downstairs. and by continuing to question him as the time for his children to return from school approached. He asserts that the district court ignored this "atmosphere of coercion" when it ruled on his motion to suppress.

Sufficient evidence supports the district court's conclusion that Hopson voluntarily waived his *Miranda* rights and confessed to the robberies. Agent Brenneman told Hopson "that he was not under arrest, was not going to be placed under arrest[,] and when we left the house at the conclusion of the search warrant, that [he] would remain at the scene and not go with us and be placed under arrest." When the agents asked Hopson whether there was a place other than the kitchen where they could talk, it was Hopson who suggested the basement. In the basement, the agents provided Hopson an extra pair of handcuffs for his comfort, and everyone "joked" about this. Additionally. Hopson and a Columbus police officer "laughed" about Sanese's head of security, a mutual acquaintance. While the agents did place Hopson in handcuffs, and while Hopson testified that he felt "coerced" and feared for his wife and children, this evidence, when placed in the context of the totality of the evidence, does not compel a finding of coercion.

Hopson's argument that the district court disregarded evidence of an "atmosphere of coercion" is unavailing, notwithstanding Hopson's reliance upon *United States v. Finch,* 998 F.2d 349 (6th Cir. 1993). The district court did not expressly address Hopson's testimony that he feared for the safety of his wife and children, but *Finch* does not require such formalized findings. In *Finch,* the court chided the district court for expressing no conclusion *whatsoever* concerning the voluntariness of the defendant's confession—not for failing to address the defendant's argument point-by-point. *Id.* at 355–56. Here, after listening to testimony from Hopson and the agents, the district court found Hopson's confession to be voluntary, and there is no indication that the district court ignored Hopson's testimony in reaching its decision.

Nor does *Finch* require a finding of coercion under the present facts. The *Finch* court cited a number of facts contributing to its conclusion that the defendant's confession to cocaine possession was involuntary: the officers broke down the front door of the defendant's house, broke down a locked bedroom door, and confronted the defendant, his mother, and his girlfriend with drawn guns; the officers detained the three; and the officers threatened to arrest the defendant's mother and companion unless the defendant confessed. *Id.* at 355. The court's finding of coercion rested primarily on the fact that the officers threatened to arrest the defendant's loved ones, a circumstance not present in the instant case. *Id.* at 356 (stressing that "threats to arrest members of a suspect's family may cause a confession to be involuntary").

### C. Legality of Hopson's Detention

█ The district court did not commit plain error by failing to deem Hopson's confession the product of an illegal deten-

tion. The Fourth Amendment prohibits unreasonable searches and seizures. "A 'seizure' occurs when police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave." *United States v. Obasa*, 15 F.3d 603, 606 (6th Cir.1994). A brief investigatory detention by an officer with a reasonable suspicion of criminal activity is not an unreasonable seizure. *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir.1994) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Similarly, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premise while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

Importantly, though, when a detention matures into a full-fledged arrest, the Fourth Amendment demands that the seizure be supported by probable cause. *Centanni*, 15 F.3d at 590; *see also Summers*, 452 U.S. at 705 n. 21, 101 S.Ct. 2587 (stating that "special circumstances" or a "prolonged detention" might render a detention pursuant to the execution of search warrant for contraband unreasonable). "[A]t some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth [Amendment]." *Centanni*, 15 F.3d at 590 (quoting *Hayes v. Florida*, 470 U.S. 811, 815–16, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1983)). Of course, there is no "litmus-paper test" for determining when a seizure exceeds the bounds of an investigative stop given the endless variations in the facts and circumstances of

cases raising the issue. *Obasa*, 15 F.3d at 607.

For the first time on appeal, Hopson argues that his detention violated the Fourth Amendment. Hopson acknowledges that, under *Summers*, the agents were entitled to detain to him to facilitate the execution of the search warrant. He contends, however, that the agents' actions do not fall within the *Summers* exception because the agents went to the house with the purpose of interrogating him and because the length and scope of the detention exceeded that necessary to facilitate the execution of the warrant.

It was not plain error for the district court to fail to suppress Hopson's confession as the product of an illegal detention. Assuming for argument's sake that the agents' detention and questioning of Hopson matured into (or was from the start) an arrest, and that the agents' conduct was not justifiable under *Summers*, it is not obvious from the record that the agents lacked probable cause to arrest Hopson. *See Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir.2003) (stating that for an officer to have probable cause for arrest "there must be 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense'" (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). Therefore, it cannot be said that the district court committed plain error by not suppressing the confession on the ground that Hopson's detention was illegal. *See United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (defining "plain" as "clear" or "obvious").[3]

3. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), upon which Hopson relies, is inapposite. In *Duna-*

*way*, the Court held that police officers violated a suspect's Fourth Amendment rights when, without probable cause, they seized the

#### 2. *"Prejudicial Misjoinder"*

■ The district court did not commit plain error by failing to recognize a "prejudicial misjoinder" problem. "Prejudicial misjoinder," to use Hopson's term, occurs "where the count justifying the joinder was not alleged by the government in good faith, i.e., with the reasonable expectation that sufficient proof will be forthcoming at trial." *United States v. Adkinson*, 135 F.3d 1363, 1374 (11th Cir.1998). In such cases, there is "a high risk of undue prejudice" as "joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." *United States v. Aldrich*, 169 F.3d 526, 528 (8th Cir.1999) (internal quotation omitted).

Hopson alleges that he was a victim of prejudicial misjoinder because the Government could not have had any reasonable expectation of convicting Hopson of the March 27 robbery. "The inclusion of the March 2001 counts in the same indictment charging him with the October 2001 robbery and firearms counts," Hopson asserts, "was simply a way for the government to expose the jury to evidence of another violent crime that would not otherwise be admissible against him under Fed. R.Evid. 404(b)." Hopson concedes that the plain error standard applies to this claim because his trial counsel failed to raise the issue in the district court.

Contrary to Hopson's charge, the Government did present significant evidence connecting Hopson to the March 27 robbery, either as a principal or as an aider and abettor. In particular, the Government presented the following testimony: (1) Sanese's head of security testified that one of the three robbers caught on video-

tape by a security camera resembled Hopson in height and gait; (2) various witnesses testified that Hopson was privy to generally confidential information concerning Sanese's security and money storage practice; and (3) Agent Brenneman testified that Hopson confessed to drawing a map of the inside of the Sanese building for the robbers and to accepting $1,000 of the proceeds. Thus, the evidence of Hopson's guilt of the March 27 robbery, while hardly overwhelming, was not so meager that it was plain error for the district court not to declare a mistrial *sua sponte* or take other action. *See Olano*, 507 U.S. at 734, 113 S.Ct. 1770 (defining "plain" as "clear" or "obvious").

#### 3. *Jury Instruction Issues*

The district court did not commit reversible error in instructing the jury on the jurisdictional element of the Hobbs Act or in responding to a query from the jury concerning the finding necessary to convict Hopson of aiding and abetting the crime of carrying and brandishing a weapon during a crime of violence.

"This circuit has set a high standard for reversal of a conviction on the grounds of improper instructions." *United States v. Sheffey*, 57 F.3d 1419, 1429 (6th Cir.1995). This court "reviews a jury charge in its totality to determine whether it fairly and adequately submits the issues and law to the jury." *United States v. Alvarez*, 266 F.3d 587, 595 (6th Cir.2001) (internal quotation omitted). "A judgment may only be reversed if the instructions, viewed in their totality, were confusing, misleading or prejudicial." *Id.* (internal quotation omitted).

suspect and transported him to the police station for questioning. *Id.* at 216, 99 S.Ct. 2248. The Court declined to extend *Terry* and hold that "custodial interrogations" may be justified by mere "reasonable suspicion." *Id.*

at 211, 99 S.Ct. 2248. In the instant case, instead of being taken to a police station, Hopson was detained and questioned while occupying premises being searched pursuant to a warrant.

"The trial court is entitled to exercise its sound discretion in deciding how best to respond to inquiries made by the jury during its deliberations." *United States v. Brown,* 276 F.3d 211, 216 (6th Cir.2002). "When a jury seeks clarification of particular issues, however, the judge should clear away its difficulties with concrete accuracy." *United States v. Nunez,* 889 F.2d 1564, 1568 (6th Cir.1989) (internal quotation omitted).

*A. Jury Instruction on the Jurisdictional Element of the Hobbs Act*

■ Contrary to Hopson's argument, the district court correctly instructed the jury on the jurisdictional element of the Hobbs Act. "In order to prevail under a Hobbs Act violation, the Government must prove two elements: 1) interference with interstate commerce, which is a jurisdictional issue; and 2) the substantive criminal act, which in the instant case is ... robbery." *United States v. Turner,* 272 F.3d 380, 384 (6th Cir.2001) (internal quotation omitted). Generally speaking, to satisfy the jurisdictional element, the Government need only show that the defendant's criminal activity had a *de minimis* effect on interstate commerce. *United States v. Mills,* 204 F.3d 669, 671 (6th Cir.2000); *United States v. Smith,* 182 F.3d 452, 456 (6th Cir.1999).

The district court instructed the jury on the jurisdictional element as follows:

> I also use the term "interstate commerce." Interstate commerce means commerce, business activities or travel between one state, territory or possession of our country and another state, territory or possession of our country. The government must prove a substantial effect on interstate commerce. A robbery may substantially affect interstate commerce if you find that the victim of the robbery conducted a substantial part of its business in the movement of articles among the various states. *If you find [that] the victim conducts a substantial part of its business through interstate commerce, then the effect on interstate commerce of these robberies need only be minimal.*

J.A. at 233–34 (emphasis added).

Hopson argues that, by including the italicized language in the instruction, the district court "diminished the government's burden of proof below that of proof beyond a reasonable doubt and constituted error." Hopson acknowledges the legion of authority construing the jurisdiction element as requiring only a *de minimis* effect on interstate commerce, but counters that these cases simply set the standard controlling appellate review of the sufficiency of the evidence supporting a conviction.

Hopson's argument is unavailing. The challenged instruction accurately defines the jurisdictional element, as construed by the Sixth Circuit, and in no way suggests that the jury should apply a standard lower than "beyond a reasonable doubt" to this element. Considered in their entirety, the instructions state that the jurisdictional element requires proof beyond a reasonable doubt that Hopson's conduct had at least a "minimal" effect on interstate commerce, not that the "minimal" evidence satisfies the element.[4]

---

4. The challenged instruction is similar to the pattern instructions utilized in other circuits. *Fifth Circuit Pattern Jury Instructions (Criminal)* § 2.73 (West 2001) ("If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element. The effect can be minimal."); *Seventh Circuit Federal Jury Instructions (Criminal)* 299 (West 1999) ("With respect to Count ___, the government must prove that the defendant's actions affected [had the potential to affect] interstate commerce in any way or degree. This means that the natural consequences of the defendant's actions were [would have been] some effect on interstate commerce, however minimal.").

## B. Response to Jury Query Concerning the Aiding and Abetting Counts

■ The district court did not commit plain error in responding to a question from the jury concerning the finding necessary to convict Hopson of aiding and abetting the carrying and brandishing of a firearm during a crime of violence. During the jury's deliberations, the foreman submitted the following question to the district court: "If the Defendant owns or supplies the firearm used in Counts 2 or 4, can he be found guilty of aiding and abetting the firearm? OR Must [sic] Defendant physically possess the gun at the time of crime [sic]?" J.A. at 59. The district court responded with the following instruction:

To be convicted of aiding and abetting with regard to Counts 2 and 4, the Defendant does not have to physically possess the firearm at the time the crime of violence is committed, provided that you must find by proof beyond a reasonable doubt that the Defendant participated as an aider and abettor, as I have already defined for you, and that the Defendant knew the actual perpetrators of the crime would use, carry or brandish the firearm in the crime of violence.

*Id.*

On appeal, Hopson claims that this instruction was defective because it did not advise the jury that, to convict Hopson of aiding and abetting the offense of carrying and brandishing a firearm during a crime of violence, it had to find that Hopson "performed some act that directly facilitated or encouraged the use or carrying of a

firearm." According to Hopson, the Government's aiding and abetting theory required proof of three elements: (1) that the defendant aided and abetted the commission of the underlying crime of violence; (2) that the defendant had actual knowledge that the principal offender possessed a firearm; and (3) that the defendant performed some affirmative act relating to that firearm. Hopson maintains that, in response to the jury's query, the district court should have enumerated the elements of the aiding and abetting claim, and he contends that, while the court's response adequately captured the first and second elements, it omitted the third element.

Initially, this court reviews Hopson's claim under the plain error standard, as Hopson's trial counsel failed to raise the issue in the district court. *See United States v. Pearce,* 912 F.2d 159, 163 (6th Cir.1990) (reviewing jury instruction claim for plain error as the defendant had not objected on this ground in the district court nor proposed alternative instructions). Though counsel did question whether Hopson could be convicted of the aiding and abetting offense under certain factual scenarios, counsel neither identified "the performance of an affirmative act relating to the firearm" as an element of the offense nor requested that the court recite the elements of the aiding and abetting offense for the jury.[5]

■ The district court did not plainly err in responding to the jury's question. Contrary to Hopson's assertion, in the

---

5. Specifically, Hopson's trial counsel questioned whether Hopson could be convicted of aiding and abetting the offense of carrying and brandishing a firearm during a crime of violence if, in relation to the March robbery, Hopson simply provided a map of the site and knew that the perpetrators were going to use a gun (but did not provide the gun). Counsel also voiced the concern that the court's re-

sponse might be read to endorse the theory, suggested by a prosecution witness, that there was a third individual involved in the October 8 robbery—specifically, a second individual riding in the van. Notably, counsel observed that the jury had "all the instructions on aiding and abetting," and he did not accept the court's invitation to comment further on the court's proposed response.

Sixth Circuit, the Government is not required to prove that the defendant "performed some act that directly facilitated or encouraged the use or carrying of a firearm." Under a theory of aiding and abetting, "the government must prove that the defendant both associated and participated in the use of the firearm in connection with the underlying crime." *United States v. Morrow*, 977 F.2d 222, 231 (6th Cir.1992) (en banc). "This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime." *Rattigan v. United States*, 151 F.3d 551, 558 (6th Cir.1998); *see also Wright v. United States*, 182 F.3d 458, 465 (6th Cir.1999) (upholding conviction as the Government established that the defendant "knew his co-conspirators were armed" and "acted with intent to assist or influence the commission of the underlying predicate crime"); *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir.1995) (evidence of the defendant's intent to commit bank robbery, combined with the knowledge that her accomplice was using and carrying her shotgun, permitted the jury to convict the defendant of aiding and abetting). Of particular relevance, a defendant may be convicted of aiding and abetting if he is present at the scene of the crime of violence during which his accomplice carries a firearm on the reasoning that the defendant thereby "associates" himself with the firearm.[6] *See Wright*, 182 F.3d at 465; *Rattigan*, 151 F.3d at 558 (holding that the defendant "knew of [his accomplice's] gun and benefitted from its presence for protection"); *Morrow*, 977 F.2d at 231 (defendant, who harvested marijuana plants with his armed accomplice, was guilty under an aiding and abetting theory as his accomplice's firearm

"was facilitating [his] drug trafficking efforts just as it was for [his accomplice]").

Moreover, the jury's query indicates that it accepted the Government's argument that Hopson supplied the gun to his accomplice—clearly an act that "directly facilitated" the carrying of the firearm. Therefore, even if "direct facilitation" were an element of the aiding and abetting offense, the district court's failure to advise the jury of this element was harmless error as the jury found the element anyway.

*4. Sufficiency of the Evidence Concerning the Jurisdictional Element of the Hobbs Act*

■ Hopson contends that recent Commerce Clause decisions by the Supreme Court have abrogated the traditional rule that a *de minimis* effect on interstate commerce satisfies the jurisdictional element of the Hobbs Act. The district court properly applied the *de minimis* standard, as this court has previously rejected the very argument advanced by Hopson.

This court reviews de novo a district court's denial of a motion for judgment of acquittal. *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir.2002). The court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)). This court also reviews de novo constitutional challenges to criminal convictions. *United States v. Smith*, 182 F.3d 452, 455 (6th Cir.1999).

---

**6.** Under the Government's theory of the case, Hopson appeared on the scene of the crime as the driver of the getaway van.

The jurisdiction provision of the Hobbs Act is "extremely broad." *United States v. Carmichael*, 232 F.3d 510, 516 (6th Cir. 2000). The Act's "'broad jurisdictional language' has historically been construed as requiring only a *de minimis* effect on interstate commerce." *United States v. Dupree*, 323 F.3d 480, 485 (6th Cir.2003).

■ Hopson contends that, in light of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (1995), decisions enforcing limits on the breadth of Congress' power under the Commerce Clause, the Government must show a "substantial effect" on interstate commerce in order to satisfy the Act's jurisdictional provision. Hopson further argues that the Government failed to present sufficient evidence to meet this "substantial effect" standard. Hopson concedes, however, that this circuit has adhered to the *de minimis* rule in the wake of *Lopez* and its progeny, explaining that he raised the argument "for purposes of preserving this important issue in the event there is a change in the law during the pendency of the appeal or certiorari is sought to the Supreme Court." Hopson apparently concedes that the Government adduced sufficient evidence to satisfy the *de minimis* standard.[7]

As Hopson acknowledges, this court has held that the *de minimis* rule in Hobbs Act cases survives *Lopez* and *Morrison*. *Dupree*, 323 F.3d at 484–85; *United States v. Mills*, 204 F.3d 669, 671 (6th Cir.2000); *Smith*, 182 F.3d at 456. Hospon's argument therefore fails.

### 5. Enhancement for Leadership Role in the Offense

■ The district court however erred in applying the § 3B1.1 sentencing enhancement for Hopson's role as an alleged "organizer" of the October 8 robbery. The Government bears the burden of proving that the enhancement applies by a preponderance of the evidence. *United States v. Vandeberg*, 201 F.3d 805, 811 (2000). In reviewing sentencing questions, this court applies the de novo standard to the district court's legal conclusions and the clear error standard to the district court's findings of fact. *United States v. Taylor*, 248 F.3d 506, 515 (2001); *but see United States v. Solorio*, 337 F.3d 580, 600 (6th Cir.2003) (questioning whether *Buford v. United States*, 532 U.S. 59, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001), requires a more deferential standard of review). "Determining the nature and extent of the role [Hopson] played in the offense entails a factual inquiry. which we review only for clear error." *United States v. Blandford*, 33 F.3d 685, 710 (6th Cir.1994).

§ 3B1.1(c) of the Sentencing Guidelines mandates a two-level increase in the defendant's offense level "[i]f the defendant was an organizer, leader, manager, or supervisor" of criminal activity that involved fewer than five participants. *U.S. Sentencing Guidelines Manual* § 3B1.1(c) (2001). The guidelines do not define "organizer, leader, manager, or supervisor," but they do direct the sentencing court to consider the following factors:

the exercise of decision making authority, the nature of participation in the

7. We agree that the Government adduced sufficient evidence to satisfy the jurisdictional element as presently interpreted by this court. For example, Sanese's owner testified that Sanese uses money from its vending machines to purchase a variety of out-of-state goods. *See United States v. Smith*, 182 F.3d 452, 456 (6th Cir.1999) (holding that, because the victims, which were robbed of money by the defendant, did substantial business in beer, wine, and tobacco products, virtually none of which originated in the state where the victims did business, the Government had demonstrated a *de minimis* effect on interstate commerce).

commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* § 3B1.1, cmt. n. 4. The guidelines also note that this adjustment "does not apply to a defendant who merely suggests committing the offense" and that, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id.* cmt. n. 2 & 4. The latter condition, this court has explained, means that "a defendant must have exerted some control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *United States v. Gort–DiDonato,* 109 F.3d 318, 321 (6th Cir.1997).

The Presentence Investigation Report recommended the application of the § 3B1.1(c) enhancement. Specifically, the report stated

In this case, the defendant, who was formerly employed by Sanese Services as a truck driver, was aware of the route that the victim truck driver would have driven on October 8, 2001, the date of the robbery. The evidence suggests that since the defendant would have known this he organized the offense with the other perpetrator. When the robbery occurred, the defendant initially waited nearby in his van. Once the robbery started, the defendant drove the van to the Sanese truck where the co-offender provided him bags of money that the defendant placed inside the van. Two shots were fired during the course of the offense. The shell casings were recovered by case agents. It was determined that the casings were from the round discharged from the Glock pistol that belonged to the defendant. This

pistol was recovered at the defendant's residence during the execution of the search warrant. Accordingly, the evidence suggests that the defendant provided the Glock firearm to the co-offender to use during the robbery. Based upon the nature of the defendant's involvement in this offense and the guidance outlined in the Commentary, it appears that the defendant was a leader and organizer in this offense.

J.A. at 262. Hopson objected to this recommendation, submitting that "the jury's finding in this case was premised on a theory of aiding and abetting and there was no evidence presented which would document or demonstrate that this was planned by Dion Hopson." J.A. at 279.

The district court applied the § 3B1.1(c) enhancement. Specifically, it found

It's clear in the report that this, of course, is circumstantial evidence, but I can consider that. I don't think there was any dispute from the evidence presented at trial that the defendant, Dion Hopson, had been employed by the victim in this case, Sanese Services, and was fired and had previously actually done the route in question that was robbed with regard to the two counts of conviction.

That fact plus the fact that it was his vehicle that was identified as a part of this escapade and that the gun found at his home matched the gun discharged in the course of this escapade as well would lead me to find at least by a preponderance of the evidence that there is sufficient evidence to find that he was an organizer as the term is used under 3B1.1(c).

J.A. at 90–91.

*United States v. Vandeberg,* 201 F.3d 805 (6th Cir.2000), cited by Hopson, compels the conclusion that the district court clearly erred in applying the § 3B1.1 en-

hancement. In *Vandeberg*, the defendant's accomplice burglarized the house of the defendant's employer. Though the defendant informed his accomplice that his employer would be staying at another residence at the time of the burglary, provided information regarding the home's alarm system and the location of a safe, rented a storage unit for the loot following the burglary, and sold a portion of the loot (guns) with his accomplice at a gun sale, this court concluded that the record clearly failed to support the application of the § 3B1.1(c) enhancement. *Id.* at 808, 811. The court noted that, in general, "a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted," and it found "no indication that [the defendant] either recruited [his accomplice] or exercised any authority over him." *Id.* at 811. The court rejected the Government's argument that the facts that the defendant "provided crucial information" to his accomplice and "played an important role in the offense" sufficed to show a leadership role. *Id.* at 811. "Merely playing an essential role in the offense," it stressed, "is not equivalent to exercising managerial control." *Id.* at 811–12.

As in *Vandeberg*, the Government has not identified any direct evidence that Hopson "exerted control" over his accomplice—*e.g.*, evidence that Hopson recruited his accomplice, evidence that Hopson exercised authority over his accomplice, or evidence that Hopson had a right to a larger share of the fruits of the robbery. Instead, the Government contends, as best we can discern, that the district court properly inferred that Hopson was the "organizer" of the offense from the fact that Hopson played "an essential role" in the offense—*i.e.*, that Hopson had knowledge of Sanese's operations, that Hopson supplied the van used in the robbery, and that the gun used in the crime was found at his residence. *Vandeberg,*[8] however, precludes such an inference in this case. Under *Vandeberg*, the mere showing that the defendant played an "essential role" in the offense by supplying crucial information (and providing other assistance[9]) does not satisfy the Government's burden of showing that the defendant exercised "managerial control" over other participants. Therefore, the Government's failure to identify any further evidence of Hopson's alleged leadership role (and, parenthetically, the Government's inexplicable failure to address *Vandeberg* at all[10]) leads to the conclusion that the district court erred in applying the § 3B1.1 enhancement.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part. This matter is

---

8. We note that Hopson apparently failed to bring *Vandeberg* to the district court's attention. While this does not constitute a forfeiture of his challenge to the application of the enhancement, it does explain the district court's failure to address this decision.

9. The additional assistance in the present case (supplying the getaway van and storing the gun used in the offense) is not more indicative of a leadership role than the additional assistance in *Vandeberg* (renting a storage space for loot and helping to sell loot).

10. The Government fails even to mention *Vandeberg* in its brief. *United States v. Bandy*, 239 F.3d 802 (6th Cir.2001), upon which the Government relies, is readily distinguishable. In *Bandy*, the defendant, in addition to obtaining the weapons and getaway car used in a bank robbery, proposed the robbery to his accomplices and insisted that his accomplices follow through when they were hesitant to do so. *Id.* at 806. Here, the Government has not cited any evidence that Hopson proposed the robbery or steeled his accomplice in a moment of weakness.

remanded for resentencing consistent with this opinion.