NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0432n.06

No. 24-1885

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 22, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| AVIS COWARD, | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: THAPAR, READLER, and HERMANDORFER, Circuit Judges.

THAPAR, Circuit Judge. Avis Coward pled guilty to being a felon in possession of a firearm. He now challenges the federal law that bars him from owning a gun as violating the Second Amendment, and he appeals an enhancement applied to his sentence for organizing criminal activity. Seeing no error, we affirm.

## I. FACTUAL BACKGROUND

In October 2024, Avis Coward drove with Emma Huver and her two-year-old son K.M. to a nearby gas station in Huver's white Yukon. Coward brought his .45-caliber handgun with him and left it unattended in the car when he went to pay for the gas. While Coward was inside the gas station, K.M. released himself from his car seat and crawled into the front seat. He picked up Coward's firearm, pointed it at his head, and shot himself. He tragically passed away the next morning.

Coward is a felon many times over, so federal law bars him from owning a firearm. *See* 18 U.S.C. § 922(g)(1). So, when he saw the bleeding toddler, Coward began a campaign to destroy evidence that he owned the firearm that K.M. had discharged. After passing K.M. to a paramedic, Coward rushed back to the vehicle. He first scooped up his gun, which had fallen out of the passenger side of the car. He then punched out the front passenger car window to conceal that a bullet had punctured it. While Huver waited in the gas station with her son, Coward peeled out of the parking lot in her car. Huver later told police that Coward left because "he was a felon and knew he would get in trouble because of the firearms." PSR, R. 123, Pg. ID 496.

Coward hid at a friend's house. He was arrested later that evening driving away from the house in his friend's car. During the arrest, cops found glass from the Yukon's shattered window on his right pantleg. They also found 2.5 grams of methamphetamine in plain view in the car. A search of Coward's two companions yielded still more illegal substances.

But Coward wasn't done. While waiting in the county jail, he made a set of recorded phone calls to his girlfriend Gina Schieberl and his friend Joseph Kelley. During those calls, all three repeatedly used the word "phone"—as Kelley later told police—as a codeword for firearms. On the first call, Kelley offered to "put away" anything Coward needed. *Id.* at 492. Coward directed Kelley and Schieberl to search "one of those rain troughs" near a specific fence to find his "phone." *Id.* Schieberl, sounding confused, reminded Coward that she already "got [his] actual phone." *Id.* Coward replied that this was his "other phone." *Id.* He stressed that she needed to collect it "right now, like right now, right now." *Id.* Later that day, Coward called Kelley back to ask for a status update. Kelley reported that he was "at the spot" searching "along the fence." *Id.* Coward asked if he located "two phones or one," and Kelley responded that he "found two phones." *Id.* Coward

then stated that he needed to "get rid of everything." *Id.* Kelley replied, "[Y]ou know I got you no matter what." *Id.*

Kelley meant it. Following Coward's directions, Kelley discovered Coward's .45-caliber handgun and Huver's purple-and-silver firearm. He kept Huver's gun with him. But he dismantled Coward's, hiding the barrel and spent shell casings in a friend's basement. He then sold the rest to a drug dealer in exchange for methamphetamine. At the same time, Kelley worked to dispose of the white Yukon. After hiding the car for a few days, he spray-painted it black, then directed two friends to burn the vehicle in the woods.

A week after K.M.'s death, police arrested Kelley on an outstanding warrant. At the station, Kelley explained Coward's plot to conceal evidence, ranging from the codewords used on the recorded phone calls to the hiding spot for Coward's gun to the location of the burned Yukon. Investigators recovered the vehicle and the barrel of Coward's firearm, though the rest of the gun remains missing.

In December, a grand jury indicted Coward and Huver for illegally possessing firearms while convicted felons. 18 U.S.C § 922(g)(1); *see also id.* § 924(a)(8). Coward and Schieberl were also charged with conspiring to tamper with evidence and tampering with evidence. 18 U.S.C. § 1512(k), (c)(1). Kelley separately pled guilty to possessing a firearm while a convicted felon and was sentenced to 42 months in prison.

In response, Coward moved to dismiss the felon-in-possession charge as "unconstitutional on its face and as applied to [him]." Br. in Supp. of Mot. to Dismiss, R. 76, Pg. ID 168. The district court rejected both challenges. Coward then pled guilty to the felon-in-possession charge, and the government dismissed the evidence-tampering counts. In his plea, Coward explicitly reserved his right to appeal the district court's denial of his motion to dismiss.

At sentencing, the district court enhanced Coward's sentence by two levels for organizing or leading a conspiracy to obstruct justice. U.S.S.G. § 3B1.1. Based on this enhancement, the court calculated a recommended sentence of 135 to 168 months in prison. Varying downward, it sentenced Coward to 120 months in prison to be served consecutively to any sentence imposed in his ongoing state proceedings. Coward timely appealed.

## II. ANALYSIS

### A. Felon-in-Possession Ban

Coward challenges 18 U.S.C. § 922(g)(1) as inconsistent with the Second Amendment both facially and as applied to him. We review the district court's determination that § 922(g)(1) was constitutional de novo. *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003). Coward's challenges both fail.

*Facial Challenge.* We have already rejected a facial challenge like the one Coward raises here. In *United States v. Williams*, we concluded that "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous." 113 F.4th 637, 657 (6th Cir. 2024). Since "most applications" of § 922(g)(1) disarm dangerous individuals, the provision is "not susceptible to a facial challenge." *Id.*

*As-Applied Challenge.* To bring a successful as-applied challenge, a defendant must show that he is not one of the dangerous individuals that Congress may permissibly disarm. *Id.* at 657–58. When considering whether a defendant is "dangerous," courts look to the defendant's "entire criminal record—not just the predicate offense for purposes of § 922(g)(1)." *Id.*; *see also id.* at 659–60. This holistic review extends to any "specific characteristics" or other "judicially noticeable information," like offense conduct detailed in a presentence investigation report or statements at sentencing. *Id.* at 657, 660; *see also United States v. Fordham*, No. 24-1491, 2025

WL 318229, at *5 (6th Cir. Jan. 28, 2025). It takes only one "dangerous" offense to determine that an individual may be permissibly disarmed. *Williams*, 113 F.4th at 662. And some offenses are so obviously dangerous that committing one is all but "totally dispositive." *Id.* at 658. As we have generalized, defendants are dangerous if they have committed either (1) "a crime against the body of another human being," like murder, rape, assault, and robbery, or (2) "a crime that inherently poses a significant threat of danger," like drug trafficking and burglary. *Id.* at 663 (cleaned up).

Coward has committed several of these presumptively "dangerous" offenses. Start with his conviction for armed carjacking. In 2002, two months after being released from prison, Coward carried out one in a long string of armed carjackings completed by a gang of thieves. Coward approached two men in a parked car, brandished a .45-caliber Ruger handgun, and demanded that they exit the vehicle and leave the keys. The men complied, and Coward stole their car. He later admitted that he would have inflicted death or serious bodily harm on the two men if they hadn't given him their car. He was sentenced to 125 months' imprisonment for carjacking and brandishing a firearm during a crime of violence. This conviction alone is more than enough to determine that Coward is dangerous.

But Coward's crimes don't stop there. Coward has tallied up several convictions for offenses that fall into *Williams*'s second category of conduct that "inherently poses a significant threat of danger" to others. *Id.* at 663. From 1998 to 1999 alone, he was convicted of carrying a concealed weapon, possessing and distributing drugs, and breaking and entering—three dangerous felonies in rapid succession. After completing sentences for armed carjacking and drug possession, he was sent back to jail for leading police officers on a high-speed chase. Coward endangered his passenger, law enforcement, and other motorists when he blew through a red light,

crashed in the woods, and fled the scene on foot. *See United States v. Martin*, 378 F.3d 578, 582 (6th Cir. 2004). Coward's repeated criminal behavior is more than sufficient to conclude his conduct "inherently pose[d] a significant threat of danger" to others. *Williams*, 113 F.4th at 663.

These offenses confirm that Coward is—and has long been—dangerous. He may therefore be disarmed consistent with the Second Amendment.

### B. Leadership Enhancement

Coward also objects to the district court's application of the two-level "leadership enhancement" in U.S.S.G § 3B1.1(c). The government bears the burden of proving that the enhancement applies by a preponderance of the evidence. *United States v. Minter,* 80 F.4th 753, 758 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 1078 (2024) (mem.). We review the district court's factual findings about Coward's activities for clear error and its legal conclusion that an enhancement applies de novo. *United States v. Hills*, 27 F.4th 1155, 1193 (6th Cir. 2022). Since the leadership enhancement poses a fact-bound question, our review is deferential. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (citing *Buford v. United States*, 532 U.S. 59, 66 (2001)).

The sentencing guidelines recommend a two-level enhancement when a "defendant was an organizer, leader, manager, or supervisor" in criminal activity involving more than one but fewer than five other participants. U.S.S.G. § 3B1.1(c). The defendant need only "manage, supervise, lead, or organize at least one participant in a criminal enterprise" to warrant the enhancement. *United States v. Gort-Didonato*, 109 F.3d 318, 322 (6th Cir. 1997). To determine whether a defendant's conduct demonstrates the requisite degree of leadership, we weigh the defendant's decision-making authority, the nature of his participation, his control over others, his role in recruitment and planning, the scope of his illegal activity, and his share of the profits. *Washington*,

715 F.3d at 983 (citing U.S.S.G. § 3B1.1 cmt. 4); *United States v. Tanner*, 837 F.3d 596, 603 (6th Cir. 2016) (same); *see also* U.S.S.G. § 3B1.1(c) cmt. background (noting that § 3B1.1(c) is "inclusive[]"). These factors are not exhaustive, not mandatory, and not binding.

The district court correctly concluded that Coward was a leader in the conspiracy because he organized, supervised, and planned the evidence tampering. At the outset, Coward recruited both Kelley and Schieberl. Coward used his jail calls to elicit their verbal commitment to conceal evidence implicating him in a crime. After they agreed to help, he provided instructions to put the plan in motion and monitored their progress with a follow-up call. On these calls, he communicated key details that only he knew (e.g., search the "rain troughs"), controlled the timing of the operation (e.g., act "right now, like right now"), and enforced the use of codewords (e.g., find the "other phone"). PSR, R. 123, Pg. ID 492. He then received reassurance that his accomplices "got [him] no matter what" and would accomplish the overarching goal of "get[ting] rid of everything." *Id.* And, once all was said and done, he stood to benefit most from the plan's successful execution. In short, Coward is a textbook "leader" of a conspiracy.

Coward raises multiple objections to the enhancement. But none is persuasive.

*First*, Coward makes much of the fact that Kelley "offered" to participate. Appellant Br. at 10. But the relevant fact is that Coward reached out to and then directed his accomplices, not that their participation was voluntary. It would make little sense to consider a defendant a "leader" when he forced an unwilling subordinate to engage in criminal conduct but not when he actively directed an enthusiastic partner. On this reasoning, we have upheld leadership enhancements applied to defendants who "offered" like-minded accomplices "the option" to participate in criminal activity, *see United States v. Bandy*, 239 F.3d 802, 806–07 (6th Cir. 2001), entered consensual contractual relationships with their co-conspirators, *see United States v. Kraig*, 99 F.3d

1361, 1370 (6th Cir. 1996), or voluntarily joined an existing conspiracy, *see Washington*, 715 F.3d at 983–84.  At the end of the day, the fact that his accomplices were willing participants does not change that Coward was the organizer or leader of this conspiracy.

*Second*, Coward argues that Kelley made independent decisions when disposing of the evidence.  But this doesn't change that Coward recruited his accomplices to help him "get rid of everything," directed them to "do that right now, like right now, right now," and supervised their retrieval to confirm they had collected both firearms.  PSR, R. 123, Pg. ID 492.  Coward's orders may have required Kelley to fill in the particulars—but what matters is that Coward gave the directive.

Nor does it matter that Kelley may have exercised so much decisional authority that he was also a leader of the evidence-tampering conspiracy.  As we have noted, "more than one person can be an organizer or leader" at the same time.  *Washington*, 715 F.3d at 984.  So, for instance, the fact that Kelley recruited friends to burn the Yukon without Coward's explicit direction might subject Kelley to the enhancement in his own right.  But Kelley's supervision of others does not make Coward any less of a leader of both Kelley and Schieberl.

*Third*, Coward claims that he did not receive a larger share of the conspiracy's profits than Kelley.  That's because Coward views its only "fruits" as the drugs that Kelley received in exchange for selling components of Coward's gun.  But intangible benefits may still be "fruits" of a criminal enterprise.  Coward believed that the destruction of evidence could save him from decades in prison.  This personal benefit from the evidence tampering far eclipses the value of the drugs that Kelley received for selling the gun parts.

*Fourth*, Coward argues that "provid[ing] crucial information to his accomplice was [not] enough to show a leadership role."  Appellant Br. at 18.  That's incorrect from premise to

conclusion. For starters, Coward did not merely provide information—he recruited, directed, and supervised Kelley and Schieberl. And even if he hadn't given a single order, Coward's sole control over critical information provides powerful evidence that he planned and organized the conspiracy.

In *Kraig*, for instance, we affirmed the application of this enhancement based solely on testimony that the defendant "provided information" to co-conspirators, meaning "it was to [him] that these persons turned for information." 99 F.3d at 1370. The information asymmetry between the defendant and his partners suggests that he played an organizational role in the conspiracy. *Id.*; *see also United States v. Dupree*, 323 F.3d 480, 494 (6th Cir. 2003) ("The key is that [the defendant] supplied . . . insider information . . . ; in this sense, he supervised [his co-conspirators]."); *United States v. Taniguchi*, 49 F. App'x 506, 519 (6th Cir. 2002). As in *Kraig*, this conspiracy could not have occurred without Coward directing his accomplices to the vehicle and providing detailed instructions to find the guns. This control over essential information shows that Coward was calling the shots.

*Fifth*, Coward relies on our unpublished opinion in *Hopson* to argue that "merely playing an essential role in the offense" is not enough to warrant the leadership enhancement. Appellant Br. at 18 (cleaned up); *United States v. Hopson*, 134 F. App'x 781 (6th Cir. 2004). But he misconstrues our decision. There, we made the uncontroversial statement that merely providing assistance—e.g., supplying a getaway van, renting a storage space for loot, or selling contraband— is not sufficient to demonstrate leadership. *See id.* at 796 n.9; *United States v. Vandeberg*, 201 F.3d 805, 808, 811 (6th Cir. 2000). But we specifically distinguished cases when a defendant recruited participants, proposed a plan, and monitored completion. *See Hopson*, 134 F. App'x at 796 n.10 (citing *Bandy*, 239 F.3d at 806–07). As should be clear by now, Coward falls into this second category: He recruited two accomplices, provided information and a plan, encouraged

them to complete it, and supervised their progress. Unlike in *Hopson* and *Vandeberg*, Coward's "essential role" was the one that mattered—leading the criminal activity.

In sum, the district court found facts sufficient to conclude that Coward recruited two accomplices, gave them directions to engage in criminal activity, orchestrated the timing of the operation, monitored its progress, and benefitted disproportionately from the activity. This conduct more than justifies the application of the enhancement in U.S.S.G. § 3B1.1(c).

### III. CONCLUSION

Avis Coward's felon-in-possession conviction is consistent with the Second Amendment, and his sentence properly accounts for his role in organizing evidence tampering. We thus affirm Coward's conviction and sentence.